No. 15-1919

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

_____

W.T. DAVIS, INDIVIDUALLY AND ON BEHALF OF A CLASS OF
TAXPAYERS OF GARLAND COUNTY, ARKANSAS, SIMILARLY
SITUATED, AND; GARLAND COUNTY CHAPTER OF THE N.A.A.C.P.

PLAINTIFFS - APPELLEES

V.

HOT SPRINGS SCHOOL DISTRICT; ARKANSAS, STATE OF; ARKANSAS
STATE BOARD OF EDUCATION

DEFENDANTS - APPELLEES

CUTTER MORNING STAR SCHOOL DISTRICT; FOUNTAIN LAKE
SCHOOL DISTRICT; JESSIEVILLE SCHOOL DISTRICT; LAKE HAMILTON
SCHOOL DISTRICT; LAKESIDE SCHOOL DISTRICT; MOUNTAIN PINE
SCHOOL DISTRICT

DEFENDANTS - APPELLANTS

_____

## BRIEF OF APPELLANTS

_____

Jess Askew III, Ark. Bar No. 86005
Jess.Askew@kutakrock.com
Ashley W. Hudson, Ark. Bar 2007136
Ashley.Hudson@kutakrock.com
KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201
Telephone: (501) 975-3000
Facsimile: (501) 975-3001

D. Scott Hickam
D. Scott Hickam, P.A.
211 Hobson Avenue, Suite C
Hot Springs, AR 72913
dscotthickam@sbcglobal.net

*Attorneys for Appellants Cutter Morning Star School
District, Fountain Lake School District, Jessieville
School District, Lake Hamilton School District, Lakeside
School District and Mountain Pine School District*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This school-desegregation case implicates a district court's resolution of a Rule 60(b)(5) motion based on a significant change in law. The district court erroneously required evidence of past compliance with a Settlement Agreement that incorporates an outdated, unconstitutional law. In requiring such evidence, the district court erred in failing to apply a more flexible standard that this Court recently found applicable under these circumstances. If the district court had applied the correct standard for termination under Rule 60(b)(5), it would have determined that continued application of a law found to violate the Equal Protection Clause is no longer equitable.

This case raises serious, straight-forward issues of a constitutional magnitude. Appellants respectfully request 15 minutes of oral argument per side.

Appellate Case: 15-1919     Page: 2     Date Filed: 06/24/2015 Entry ID: 4288508

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND
REQUEST FOR ORAL ARGUMENT ................................................................i

TABLE OF CONTENTS...............................................................................ii

TABLE OF AUTHORITIES ........................................................................iv

JURISDICTIONAL STATEMENT ..............................................................vii

STATEMENT OF THE ISSUES...................................................................viii

STATEMENT OF THE CASE.......................................................................1

SUMMARY OF THE ARGUMENT ..............................................................10

ARGUMENT ............................................................................................12

I.      Standard of Review...........................................................................12

II.     The District Court Applied the Wrong Legal Standard for Deciding
        this Rule 60(b)(5) Motion...................................................................12

III.    Changes in the Law Require Relief from the Settlement Agreement and
        Consent Decree...............................................................................19

        a.      The Legal Changes ..............................................................19

        b.      The Legal Changes Make Prospective Enforcement Inequitable .......23

                i.      Compelling State Interest ..........................................25

                        1.      Remedying Past Discrimination..........................25

                        2.      Student Diversity............................................31

                ii.     Narrow Tailoring .....................................................32

CONCLUSION ........................................................................................35

Appellate Case: 15-1919      Page: 3      Date Filed: 06/24/2015 Entry ID: 4288508

CERTIFICATE OF COMPLIANCE ...................................................................... 36

CERTIFICATE OF SERVICE ............................................................................ 37

ADDENDUM ........................................................................................... ADD 1

**JOINT APPENDIX SEPARATELY BOUND**

Appellate Case: 15-1919    Page: 4    Date Filed: 06/24/2015 Entry ID: 4288508

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995)................................................................................24

*Agostini v. Felton*,
521 U.S. 203 (1997)................................................................................12

*Alexander v. Britt*,
89 F.3d 194 (4th Cir. 1996) ...................................................................18

*Bd. of Ed. of Okla. Pub. Sch. v. Dowell*,
498 U.S. 237 (1991)..................................................................14, 18, 28

*City of Richmond v. J.A. Croson Co.*,
480 U.S. 469 (1989)................................................................................26

*Coca-Cola Co. v. M.R.S. Distribs. Inc.*,
224 F. App'x 646 (9th Cir. 2007) ...........................................................18

*Freeman v. Pitts*,
503 U.S. 467 (1992)........................................................................ *passim*

*Frew v. Hawkins*,
540 U.S. 431 (2004)................................................................................14

*Frew v. Janek*,
780 F.3d 320 (5th Cir. 2015) .................................................................12

*Gratz v. Bollinger*,
539 U.S. 244 (2003) ...............................................................................24

*Grutter v. Bollinger*,
539 U.S. 306 (2003)..........................................................................29, 31

*Harvey v. Johanns*,
494 F.3d 237 (1st Cir. 2007)..................................................................20

*Hirabayashi v. United States*,
320 U.S. 81(1943)...................................................................................23

iv

*Horne v. Flores,*
    557 U.S. 433 (2009)..................................................................13, 27

*Hunter v. Underwood,*
    362 F.3d 468 (8th Cir. 2004) ..............................................12

*Inmates of Suffolk Co. Jail v. Rouse,*
    129 F.3d 649 (1st Cir. 1997).........................................21, 22

*Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1,*
    778 F.2d 404 (8th Cir. 1985) ..............................................27

*Milliken v. Bradley,*
    418 U.S. 717 (1977).........................................................14, 27

*Milliken v. Bradley,*
    433 U.S. 267 (1977)..............................................................29

*Missouri v. Jenkins,*
    515 U.S. 70 (1995)................................................................ 14

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007)........................................................ *passim*

*Plyler v. Moore,*
    100 F.3d 365 (4th Cir.1996) ...............................................22

*Protectoseal Co. v. Barancik,*
    23 F.3d 1184 (7th Cir. 1994) ...............................................18

*Rufo v. Inmates of Suffolk Cnty. Jail,*
    502 U.S. 367 (1992)........................................................ *passim*

*San Antonio Indep. Sch. Dist. v. Rodriguez,*
    411 U.S. 1 (1973)..................................................................14

*Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.,*
    769 F.3d 566 (8th Cir. 2014) ............................................ *passim*

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
    402 U.S. 1 (1971)..................................................................29

Appellate Case: 15-1919    Page: 6    Date Filed: 06/24/2015 Entry ID: 4288508

*Teague ex rel. T.T. v. Ark. Bd. of Educ.*,
    873 F. Supp. 2d 1055 (W.D. Ark. 2012) ................................................. *passim*

*Teague v. Cooper*,
    720 F.3d 973 (8th Cir. 2013) ..................................................... *passim*

## STATUTES AND RULES

Ark. Code Ann. § 6-18-206(g)(1) ............................................................2

Ark. Code Ann. § 6-18-206(a)(5) ...........................................................1

Ark. Code Ann. §§ 6-18-1901, *et seq.* .................................................20

Federal Rule of Civil Procedure 60(b)(5) ..................................... *passim*

Appellate Case: 15-1919    Page: 7    Date Filed: 06/24/2015 Entry ID: 4288508

# JURISDUCTIONAL STATEMENT

The original plaintiffs sued the seven public school districts in Garland County for an alleged violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution. The district court has jurisdiction under 28 U.S.C. § 1331. The parties settled the case in 1992. The district court adopted the settlement in a consent decree.

In 2014, the six Garland County school districts that bring this appeal (the "Districts") filed their motion to terminate the settlement under Federal Rule of Civil Procedure 60(b)(5). The district court denied the Districts' Rule 60(b)(5) motion on March 31, 2015. Because denial of a Rule 60(b)(5) motion is a final order that disposes of all parties' claims, *see Horne v. Flores*, 557 U.S. 433, 439 (2009), the Districts filed a timely notice of appeal on April 22, 2015. This Court's jurisdiction is therefore based on 28 U.S.C. § 1291, which provides for jurisdiction over a final judgment from a United States district court.

Appellate Case: 15-1919    Page: 8    Date Filed: 06/24/2015 Entry ID: 4288508

## STATEMENT OF THE ISSUES

1. Whether the District Court Applied the Wrong Legal Standard for Deciding this Rule 60(b)(5) Motion.

  *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992).

  *Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566 (8th Cir. 2014).

2. Whether Changes in the Law Require Relief from the Settlement Agreement and Consent Decree.

  *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, (2007).

  *Horne v. Flores*, 557 U.S. 433 (2009).

  *Teague ex rel. T.T. v. Ark. Bd. of Educ.*, 873 F. Supp. 2d 1055 (W.D. Ark. 2012).

Appellate Case: 15-1919 Page: 9 Date Filed: 06/24/2015 Entry ID: 4288508

# STATEMENT OF THE CASE

Garland County, Arkansas, and its county seat, Hot Springs, are home to de jure racism in public secondary schools, which the federal court currently mandates and enforces. Sadly, this statement is fact rather than a poor attempt at hyperbole.

How is this possible? In 1989, the Arkansas General Assembly enacted the Arkansas Public School Choice Act of 1989—a school-choice law designed "to enable any student to attend a school in a district in which the student does not reside" subject to certain restrictions. Ark. Code. Ann. § 6-18-206(a)(5) (repealed); Addendum ("Add.") 12–16 (the "1989 Act"). Under the 1989 Act, Arkansas students in secondary schools could transfer to schools outside of their district of residence, but only if they were a member of a certain race. Consider the following limitations and their focus on race:

> (1) No student may transfer to a nonresident district where the percentage of enrollment for the student's race exceeds that percentage in his resident district except in the circumstances set forth in subdivision (2) of this subsection.

> (2) A transfer to a district is exempt from the restriction set forth above if all districts within a county have voted to participate in choice, and the transfer is between two (2) districts within a county and if the black and white percentages of school enrollment in both the sending and receiving district remains within an acceptable range of the county's overall black and white percentages of school population as set forth by the Department of Education.

1

(3) The Department of Education shall, by the filing deadline each year, compute the black and white percentages of each county's public school population from the October Annual School Report and shall then compute the acceptable range of variance from those percentages for school districts within each county. In establishing the acceptable range of variance the department is directed to use the remedial guideline established in Little Rock School District v. Pulaski County Special School District of allowing an overrepresentation or underrepresentation of black or white students of one fourth (1/4th) or twenty-five percent (25%) of the county's racial balance.

(4) A transfer is exempt from the restriction set forth in subdivision (1) of this subsection if each school district within the county does not have a critical mass of minority students of more than ten percent (10%) of any single race.

(5) In any instance where the foregoing provisions would result in a conflict with a desegregation court order or a district's court-approved desegregation plan, the terms of the order or plan shall govern.

(6) The Department of Education is authorized to adopt appropriate rules and regulations to implement the provisions of this section.

(7) The Department of Education shall monitor the effect of the choice transfers upon the racial balances of the school district and evaluate their effectiveness in promoting quality desegregated education.

Ark. Code. Ann. § 6-18-206(g); Add. 14–15. Thus, under the 1989 Act, a school district could deny a transfer application *solely* because of the applicant's race.

Also in 1989, the Garland County NAACP and an individual on behalf of a class of Garland County taxpayers sued the seven public school districts located in Garland County, seeking to consolidate the seven districts into one district and to cease allegedly discriminatory practices of the Garland County schools. Joint

2

Appendix (J.A.) at 1. In 1991, the parties settled the case by entering into the Garland County School Desegregation Settlement Agreement ("Settlement Agreement"). J.A. 125. The Settlement Agreement provided that the seven Garland County school districts would participate in school choice under the 1989 Act, which was participation-optional at the time. J.A. 126; *see also* 2003 Ark. Acts 1272 (making school district participation in the 1989 Act mandatory). The district court approved the Settlement Agreement; consequently, 1989 Act became firmly rooted and planted in a settlement agreement approved by a federal court. Add. 8–11.

In June 2012, Judge Dawson declared the 1989 Act unconstitutional as violating the Equal Protection Clause. *Teague ex rel. T.T. v. Ark. Bd. of Educ*., 873 F. Supp. 2d 1055, 1068 (W.D. Ark. 2012) (vacated as moot because of the repeal of the 1989 Act in *Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013)). While *Teague* was pending on appeal, the Arkansas General Assembly repealed the 1989 Act, replacing it with the Public School Choice Act of 2013 (the "2013 Act"). 2013 Ark. Acts 1227. The 2013 Act did not include the race-based limitations included in the 1989 Act. As a result, the rest of Arkansas moved on from the unconstitutional 1989 Act.

However, the 1989 Act and its race-based limitations lived on in Garland County and Hot Springs because it is anchored in the court-approved Settlement

3

Agreement. On May 22, 2013, the six school districts in Garland County that bring this appeal ("Districts") filed a Petition for Declaratory Relief in this case, requesting that the district court guide them concerning the terms of the Settlement Agreement in light of the 1989 Act's repeal. J.A. 166. The Petition requested that the Court "preserve the exact status quo" and declare that the Settlement Agreement, including its adoption of the 1989 Act, was unaffected by either *Teague* or the repeal of the 1989 Act. J.A. 171. The Districts requested such relief merely because "[a]n emergency exist[ed] in that the 1989 Act has a July 1st annual application date and the 2013 Act has a June 1st application date for student transfers." J.A. 171. Further, any additional relief, such as a Rule 60(b)(5) motion, was projected to take too long to receive in light of this emergency. District Court ECF No. 200, at 34. In other words, the Districts needed a quick answer about the state of the law in Garland County, and they had no time to request that the Court terminate the Settlement Agreement and Order that adopted it. On June 10, 2013, with consent of all parties, the district court ruled that the Settlement Agreement constituted a court-approved desegregation plan that should remain in effect despite the changes to the 1989 Act. J.A. 209.

As might be expected from a law that discriminates on the basis of race, inequitable school-choice decisions began to occur in Garland County. For example, Latishia Walker, an African-American, was a Garland County resident

Appellate Case: 15-1919    Page: 13    Date Filed: 06/24/2015 Entry ID: 4288508

who had three children, two of whom attended the Mountain Pine School District since 2013. J.A. 213. When she attempted to register her three children in the Mountain Pine School District for the 2014–2015 school year, she discovered that her property technically lay within the boundaries of the Lake Hamilton School District, despite her home being approximately 22 miles from Lake Hamilton schools and only 3.8 miles from Mountain Pine schools. J.A. 213–14.

Ms. Walker therefore submitted a transfer application to the Mountain Pine School District on behalf of her three children. J.A. 214. Because of the Settlement Agreement and Order adopting it, the Mountain Pine School District was forced to consider the application under the 1989 Act rather than the 2013 Act. J.A. 214. Because 2% of Lake Hamilton's students were African-American and 10% of Mountain Pine's students were African-American, Mountain Pine denied the transfer application because, under the 1989 Act, "[n]o student may transfer to a nonresident district where the percentage of enrollment for the student's race exceeds that percentage in the student's resident district." J.A. 214. Thus, the transfer application was denied solely because the Walkers are African-American. J.A. 214.

Ms. Walker appealed this decision to the Arkansas State Board of Education ("Board"), which considered her appeal at a meeting on August 14, 2014. J.A. 213. The Mountain Pine School District Superintendent explained that the only reason

5

that the Walker application was denied was application of the 1989 Act and the Order adopting it.[1] While recognizing the injustice of denying of a choice application on the basis of race, the Board reluctantly denied the appeal to ensure compliance with the Settlement Agreement and Order.

Eleven days after the Board denied Ms. Walker's appeal, the Districts moved the district court to terminate the Settlement Agreement and jettison the 1989 Act and its racially discriminatory provisions once and for all. J.A. 212. The Districts contended that, under Federal Rule of Civil Procedure 60(b)(5), it is no longer equitable to give the Settlement Agreement and the Order approving it prospective application in light of changes in the law since 1991. J.A. 214. Furthermore, because the district court made no finding of fact or conclusion of law—whether in 1991, 2015, or any time in between—that Garland County operated a dual school system segregated by race, no need exists for continued federal involvement. *Id.* To exemplify the unfairness and plight of Garland County students, the Districts informed the district court of the denial of the Walkers' choice application under the 1989 Act *solely* because of the Walkers' race. J.A. 213–14, 217–18.

---

[1] *See* Video of hearing, located at http://www.arkansased.gov/state-board/minutes/board_meeting_categories/2014?page=2. The hearing of the Walker appeal begins at 3:23:30 on the video.

Appellate Case: 15-1919   Page: 15   Date Filed: 06/24/2015 Entry ID: 4288508

The seventh Garland County school district, Hot Springs School District (HSSD), filed a response in opposition to the Districts' Rule 60(b)(5) motion on September 17, 2014, arguing that the Districts were "actually requesting, without explicitly saying so, that they be declared unitary and freed from court supervision," which HSSD contended was based on "inconsistent declarations, unsupported by any facts, that 'they have complied with the consent decree.'" J.A. 253. The Plaintiffs responded on October 29, 2014, and essentially adopted HSSD's response. J.A. 289.

The matter languished in the district court for a few months. To break the inertia, the Districts filed a letter to the district court in late January to (1) request a hearing on the Rule 60(b)(5) motion in the hopes of resolving the matter, and (2) apprise the district court of this Court's recent decision in *Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566 (8th Cir. 2014), which this Court decided after the Districts filed their Rule 60(b)(5) motion and which provided significant guidance to the Court. J.A. 292. On March 13, 2015, the district court scheduled a hearing for March 26, 2015, and stated that "[w]hile no testimony will be taken, Counsel should be prepared to present their parties' respective arguments in connection with this motion, as well as their suggestions as to the most appropriate way to proceed with this case." J.A. 303.

7

At the hearing, the Districts explained that they did not believe that the district court needed additional evidence to resolve the Rule 60(b)(5) motion because the Districts argued that a change in law—not facts—made prospective enforcement of the Settlement Agreement inequitable. District Court ECF No. 200, at 38. The Districts' attorney stated, "If the court wishes to have a hearing on any evidentiary issue, we're more than glad to comply." *Id.* Further,

> If the court is interested about . . . why the districts did what they did in 2013 or whether they've tried to work this out as a factual matter before coming to the court on this 60(b)(5) motion, that might be a matter for testimony. I don't think it is, but if the court wishes to do that, we could do that.

*Id.* at 38–39.

HSSD agreed that the district court should resolve the motion without additional hearings, evidentiary or otherwise. *Id.* at 33. HSSD's attorney stated that the Rule 60(b)(5) motion "can be decided from the bench. . . . [I]f the court needs to develop evidence, if the court wants to know more about the facts . . . . [t]he court can easily put the lawyers to work and tell us to bring you whatever you think you want to look at." *Id.* Thus, each side expressly informed the district court that, if the district court thought that additional evidence or testimony should be presented, the parties were willing to do so. The hearing concluded, and the district court took the motion under advisement. *Id.* at 39.

8

Five days later, the district court denied the Districts' Rule 60(b)(5) motion. The district court explained that the Districts "have not submitted any evidence to demonstrate full compliance with the Agreement, nor have they offered any proof that the vestiges of past discrimination have been eliminated. Accordingly, [the Districts] have not met the standard for termination of a desegregation decree under *Smith*. Add. 6 (footnote omitted). In a particularly sad commentary, the district court explained that it "cannot conclude that [a] single example [of racial discrimination] justifies the termination of a settlement agreement that has been in place for decades." Add. at 6.

Appellate Case: 15-1919    Page: 18    Date Filed: 06/24/2015 Entry ID: 4288508

## SUMMARY OF THE ARGUMENT

There is no room in 21st century America for de jure segregation in public schools. The district court's denial of the Districts' Rule 60(b)(5) motion necessarily means that the district court must continue to enforce the 1989 Act and its distribution of benefits and burdens on the basis of race. If ever continued enforcement of an order or decree were "inequitable," this most certainly is the case.

The district court traveled down the wrong fork in the road when it applied the *Freeman* standard rather than the *Rufo* standard, resulting in reversible error. Applying the *Rufo* standard, the 1989 Act and its racial provisions cannot withstand strict scrutiny. When coupled with the fact that the Arkansas General Assembly has repealed and replaced that unconstitutional law, a significant change in law warrants termination of the Settlement Agreement and the Order adopting it, especially where the district court never found or concluded that any of the Garland County schools districts operated a dual system.

The time has come for the district court to rescind its enforcement of de jure racial segregation in Garland County schools. Government-sponsored racial segregation—even one instance of it—should not be countenanced in 21st-century America. We ask the Court to recognize the inequity in continued enforcement of this unconstitutional law, and we ask that the Court reverse the district court's

10

denial of the Districts' Rule 60(b)(5) motion and terminate the Settlement Agreement and Order that adopts it.

11

# **ARGUMENT**

## I.    *Standard of Review*

The Court reviews the selection of the governing legal standard de novo and the district court's Rule 60(b)(5) ruling for abuse of discretion. *Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 568 (8th Cir. 2014); *Hunter v. Underwood*, 362 F.3d 468, 474 (8th Cir. 2004). "[T]he exercise of discretion cannot be permitted to stand if we find it rests upon a legal principle that can no longer be sustained." *Agostini v. Felton*, 521 U.S. 203, 238 (1997) (involving denial of Rule 60(b)(5) motion). The Court reviews de novo "any questions of law underlying the district court's decision." *Frew v. Janek*, 780 F.3d 320, 326 (5th Cir. 2015).

## II.   *The District Court Applied the Wrong Legal Standard for Deciding this Rule 60(b)(5) Motion.*

Federal Rule of Civil Procedure 60(b)(5) describes three scenarios for relief from a final judgment: "the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." The first category is inapplicable here because the Districts do not argue that the judgment in this case has been satisfied, released, or discharged. Nor do the Districts argue that any prior judgment has been reversed.

12

The Districts proceed under the third scenario, using Rule 60(b)(5) to obtain relief from a judgment or order because "applying [the judgment or order] prospectively is no longer equitable." A party may show sufficient inequity to modify or vacate a judgment or order when "a significant change either in factual conditions or in law" renders continued enforcement "detrimental to the public interest." *Horne v. Flores*, 557 U.S. 433, 447 (2009) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). The party seeking relief bears the burden of establishing that changed circumstances warrant that relief. *Id*. Once the movant carries this burden, a court abuses its discretion "when it refuses to modify an injunction or consent decree in light of such changes." *Id*.

Rule 60(b)(5) governs consent decrees in institutional-reform cases like the one here. A consent decree "is a final judgment that may be reopened only to the extent that equity requires." *Rufo*, 502 U.S. at 391. In *Rufo*, the Supreme Court adopted a "flexible standard" for modifying institutional consent decrees whereby a party seeking modification must show that "a significant change in facts or law warrants revision of the decree" and that the "proposed modification is suitably tailored to the changed circumstance." *Id*. at 393. This approach was necessary, the Court reasoned, because "such decrees . . . reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions." *Id*. at 381 (quotation omitted).

13

In desegregation cases, a district court must strive to restore state and local authorities to the control of a school system operating in compliance with the Constitution. *Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (citing *Freeman v. Pitts*, 503 U.S. 467, 489 (1992); *Bd. of Ed. of Okla. Pub. Sch. v. Dowell*, 498 U.S. 237, 247 (1991)); *see also Frew v. Hawkins*, 540 U.S. 431, 442 (2004) (explaining that a flexible approach allows courts to ensure that "responsibility for discharging the State's obligations is returned promptly to the State and its officials" when the circumstances warrant.). "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." *Milliken v. Bradley*, 418 U.S. 717, 741–42 (1974). Local control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation, and a healthy competition for educational excellence." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 50 (1973)

The Rule 60(b)(5) standard for modifying or terminating a consent decree when appliying it prospectively is no longer equitable is entirely separate and distinct from the standard for releasing a school district from a desegregation remedy due to unitary status, which draws heavily on the constitutional violator's

14

good faith. Three months after *Rufo*, the Supreme Court addressed unitary-status decisions and held that, when supervising school desegregation plans, a court should consider

> whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race, its good-faith commitment to the whole of the court's decree and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Freeman v. Pitts*, 503 U.S. 467, 491 (1992). In evaluating a school district's good faith, the court should analyze "whether the vestiges of past discrimination had been eliminated to the extent practicable." *Id.* at 492 (quoting *Dowell*, 498 U.S. at 250). HSSD contended below that *Freeman* should control the Rule 60(b)(5) motion.

Thus, the district court had to decide whether to apply *Rufo* to modify or terminate the Settlement Agreement and Order or whether it was appropriate to apply the *Freeman* unitary-status standard and require that the Districts demonstrate compliance with the Settlement Agreement and elimination of the vestiges of past discrimination. This Court recently addressed this exact dilemma in *Smith v. Board of Education of Palestine-Wheatley School District*, 769 F.3d 566 (8th Cir. 2014), where the movants sought to modify or terminate a desegregation decree based on a significant change in factual circumstances. *Id.* at 568. The district court granted the motion, and appellants contended that the

15

district court should have applied the *Freeman* standard for termination of a desegregation decree rather than the *Rufo* Rule 60(b)(5) standard. *Id.*

After explaining both standards, this Court held that appellants' reliance on *Freeman* "ignores the significant differences between a petition to modify a consent decree on account of changed circumstances, and a petition to terminate all or part of a consent decree because the party subject to the decree has fully complied with its obligations." *Id.* at 572. This Court further explained that, although past compliance with an order may be relevant, "proof of full compliance is **not** a pre-condition to obtaining relief from a consent decree's contractual mandates on account of changed circumstances, as it is when a moving party seeks termination of an injunctive decree because it has fully complied." *Id.* (emphasis added).

Here, the district court relied on *Smith* in denying the Districts' Rule 60(b)(5) motion but erroneously employed the *Freeman* standard rather than *Rufo*. The district court explained that "[c]ourts may 'relinquish continuing jurisdiction to ensure compliance with a desegregation consent decree when the moving party has demonstrated full compliance,'" Add. 5 (citing *Smith*, 769 F.3d at 572), and noted that "[t]he 'core of the termination standard' is 'whether the vestiges of past discrimination ha[ve] been eliminated to the extent practicable.'" Add. 5 (citing *Smith*, 769 F.3d at 572).

16

Despite the clear directive from *Smith* that the *Freeman* standard does not apply to Rule 60(b)(5) motions based on a change in circumstances, the district court erroneously applied it and found that the "Districts have not submitted any evidence to demonstrate full compliance with the Agreement, nor have they offered any proof that the vestiges of past discrimination have been eliminated. Accordingly, the Districts have not met the standard for termination of a desegregation decree under *Smith*." Add. 6. Further, the district court ignored the basis of the Districts' petition for relief—significant changes in law—focusing instead on whether the surrounding factual circumstances merited relief from the Settlement Agreement based on "full compliance" with its terms. Add. 6. The district court never addressed how the parties could or should continue following a Settlement Agreement that requires them to adhere to racially discriminatory student transfer policies.

The district court's analysis contradicted the crux of *Smith* and adopted the legal position rejected by *Smith* for Rule 60(b)(5) motions. Like the *Smith* appellants' rejected argument, the district court's Order "ignores the significant differences between a petition to modify a consent decree on account of changed circumstances, and a petition to terminate all or part of a consent decree because the party subject to the decree has fully complied with its obligations." *Smith*, 769 F.3d at 572. By making proof of full compliance a pre-condition to obtaining

17

prospective equitable relief from the Order adopting the Settlement Agreement, the district court directly contravened *Smith* and thus erred as a matter of law.

The district court appeared to assume that *Freeman* applied because the Districts sought termination rather than modification. Add. 5 ("Movants have made clear in their filings and at the hearing that they are not seeking a modification of the Agreement. Rather, they seek to 'terminate finally the 1992 Order, and relieve the parties of their obligations under the Settlement Agreement.'").

This does not justify the district court's clear error in using the wrong legal standard. Rule 60(b)(5) is not limited to modification as opposed to termination of an inequitable decree. Other circuits have determined that application of the *Rufo* standard does not depend on whether the movant seeks modification or termination. *See Coca-Cola Co. v. M.R.S. Distribs. Inc.*, 224 F. App'x 646, 646–47 (9th Cir. 2007) (remanding to district court for failure to analyze motion to vacate injunction under *Rufo*); *Alexander v. Britt*, 89 F.3d 194, 198–99 (4th Cir. 1996) (comparing *Rufo* with *Dowell*, which provides a similar iteration of the *Freeman* standard); *Protectoseal Co. v. Barancik*, 23 F.3d 1184, 1187 (7th Cir. 1994) (terminating injunction using *Rufo* standard based on change in law). Further, applying *Freeman* would completely ignore the Districts' ground for requesting relief. The Districts do not seek to be declared unitary or to show past compliance; rather, the Districts claim that prospective enforcement of the Settlement

18

Agreement is inequitable based on changes in law. This Court in *Smith* and Rule 60(b)(5) expressly allow this avenue of relief, and the district court erred in applying the inapplicable *Freeman* standard.

### III. Changes in the Law Require Relief from the Settlement Agreement and Consent Decree.

#### a.   The Legal Changes

If the district court had applied *Rufo*, the correct standard, it would have concluded that prospective enforcement of the Settlement Agreement is no longer equitable due to significant changes in law. The district court approved the Settlement Agreement on May 1, 1992. J.A. 165. The Settlement Agreement's stated goal was to provide a "quality education for all children of Garland County," J.A. 125, even though the Settlement Agreement contained no findings of fact or conclusions of law regarding discrimination or segregation in Garland County schools.

Since the district court approved the Settlement Agreement in 1992, important legal rulings of constitutional law have condemned the 1989 Act and its express use of race for school transfers. In 2007, the Supreme Court held that race-based student assignments in public schools are "not narrowly tailored to the goal of achieving the educational and social benefits asserted to flow from racial diversity." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701,

Appellate Case: 15-1919    Page: 28    Date Filed: 06/24/2015 Entry ID: 4288508

726 (2007). Following *Parents Involved*, Judge Dawson[2] in the United States District Court for the Western District of Arkansas struck down the 1989 Act as unconstitutional under the Equal Protection Clause in *Teague ex rel. T.T. v. Ark. Bd. of Educ.*, 873 F. Supp. 2d 1055 (W.D. Ark. 2012), vacated as moot because of the repeal of the 1989 Act in *Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013). The Arkansas General Assembly repealed and replaced the 1989 Act with the Public School Choice Act of 2013 in light of the equal protection problems identified in *Teague*. Ark. Code Ann. §§ 6-18-1901, *et seq*. (the "2013 Act"). The 2013 Act (and the now-current 2015 Act) did away entirely with the race-based interdistrict transfer provisions and mooted the constitutional decision in *Teague*. Although technically vacated on mootness grounds, Judge Dawson's reasoning in *Teague* survives and demonstrates that the 1989 Act cannot be squared with *Parents Involved* and the important changes in law since the 1992 Settlement Agreement.

The district court also failed to distinguish between a Rule 60(b)(5) motion based on significantly changed factual circumstances and a Rule 60(b)(5) motion based on significantly changed legal circumstances. When subsequent legislation changes applicable law, a judgment, even one legally correct when entered, may become prospectively inequitable. *See, e.g., Harvey v. Johanns*, 494 F.3d 237, 241

---

[2] Judge Dawson also authored the Order in this case from which the Districts appeal.

20

(1st Cir. 2007); *Inmates of Suffolk Co. Jail v. Rouse*, 129 F.3d 649, 656 (1st Cir. 1997) (explaining that "a forward-looking judgment in equity can succumb to legislative action if the legislature alters the underlying rule of law").

Since the parties entered into the Settlement Agreement, both legislative action and court decisions have rejected the 1989 Act and its race-based transfer provisions. When the Settlement Agreement and Order adopting it were first entered, the race-based transfer provision in the 1989 Act incorporated into the Settlement Agreement apparently was thought to be constitutionally sound and was then-current law in Arkansas. Since that time, significant changes in the law occurred, including the Supreme Court's decision in *Parents Involved*, the Western District of Arkansas's ruling in *Teague*, and finally, the repeal and replacement of the 1989 Act with the 2013 Act, which eliminated the race-based transfer provision. All of these actions stemmed from the fundamental, constitutional inequity of using a child's race to determine where he or she may attend public school, an equal protection abomination that has been condemned since *Brown v. Board of Education* in 1954.

The district court's Order never looked at these equities, did not analyze the effect of *Parents Involved*, *Teague*, or the repeal and replacement of the 1989 Act on the parties' obligations under the Settlement Agreement, and never addressed prospective compliance under Rule 60(b)(5). This was clear error. A federal court

21

Order that forces school districts in an entire county to apply a race-based transfer scheme based on an unconstitutional statute repealed by the state's legislative body is absolutely inequitable and cannot stand. "[E]quity requires, and the separation of powers principle permits, legislatures to direct that courts respond to changes in substantive law by revisiting forward-looking injunctions." *See Plyler v. Moore*, 100 F.3d 365, 371 (4th Cir.1996). Further, "[a] consent decree must of course be modified if, as it later turns out, one or more of the obligations [it imposes] has become impermissible under federal law." *Rufo*, 502 U.S. at 388. The race-based student transfer provision incorporated into the Settlement Agreement by the 1992 consent decree is such an impermissible obligation, and requiring the Garland County school districts to continue to operate under an unconstitutional, repealed school-transfer scheme that contradicts current Arkansas law creates an "intolerable tangle." *Rouse*, 129 F.3d at 657.

Here, the Districts requested relief under Rule 60(b)(5) because of material changes to the law, since the cornerstone of the Settlement Agreement—the 1989 Act—was found unconstitutional, repealed, and replaced by the race-neutral 2013 Act. The district court's Order erroneously ignored the change to Arkansas's school-choice law and the unconstitutional foundation upon which the Settlement Agreement rests.

Appellate Case: 15-1919    Page: 31    Date Filed: 06/24/2015 Entry ID: 4288508

The Equal Protection Clause prohibits government discrimination based on race unless the specific discrimination is narrowly tailored to serve a compelling governmental interest. "It is well-established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No.1*, 551 U.S. 701, 720 (2007). *Parents Involved* reiterated that strict scrutiny applies to governmental distribution of burdens and benefits on the basis of race. The Court has rejected the notion that so-called "benign" governmental racial classifications should be subjected to a lower standard of scrutiny, reasoning:

> [A]ll governmental action based on race—a *group* classification long recognized as 'in most circumstances irrelevant and therefore prohibited,' *Hirabayashi* [*v. United States*], 320 U.S. [81] at 100 [(1943)]—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed. These ideas have long been central to this Court's understanding of equal protection, and holding 'benign' state and federal racial classifications to different standards does not square with them. '[A] free people whose institutions are founded upon the doctrine of equality,' *ibid.*, should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons. Accordingly, we hold today that all racial classifications, imposed by whatever federal, state, or local government actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests.

Appellate Case: 15-1919    Page: 32    Date Filed: 06/24/2015 Entry ID: 4288508

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). "[R]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Parents Involved*, 551 U.S. at 720 (majority opinion) (quoting *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)). Thus "any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment to the strictest judicial scrutiny." *Adarand*, 515 U.S. at 224.

Because the Settlement Agreement limits the rights of individual schoolchildren based on their race and requires the public school districts in Garland County to differentiate among students based on their race, its proponents must satisfy strict scrutiny analysis and "demonstrate that the use of individual racial classifications…under review is 'narrowly tailored' to achieve a 'compelling' government interest." *Parents Involved*, 551 U.S. at 720 (citing *Adarand*, 515 U.S. at 227). As the logic of *Teague* demonstrates, the racial classification system adopted by the Settlement Agreement cannot survive strict scrutiny.

24

i.      Compelling State Interest

1.      *Remedying Past Discrimination*

The Supreme Court instructs "that our prior cases, in evaluating the use of racial classifications in the school context, have recognized two interests that qualify as compelling. The first is the compelling interest of remedying the effects of past intentional discrimination." *Freeman*, 503 U.S. at 494. This first potential compelling interest is inapplicable because the district court has not found past intentional discrimination with respect to any of the Garland County school districts.

While the plaintiffs alleged discrimination in their 1989 complaint, the school-district defendants denied the allegations, and the district court never found that discrimination actually occurred. Instead, in an effort to resolve the litigation, the parties entered into the Settlement Agreement in 1991, which was incorporated into the district court's 1992 Order. The *alleged* existence of intentional discrimination more than twenty years ago cannot serve to justify a racial classification for interdistrict transfers of Garland County schoolchildren today.

HSSD essentially conceded that the district court never made any specific findings of fact as to alleged discrimination, acknowledging that "[t]he Complaint made it clear that the Plaintiffs believed, and were prepared to prove, that 'Garland County maintained or condoned a racially segregated structure of public education

25

under color of state law.'" J.A. 254. The foundation of the parties' Settlement Agreement was the unproven "belief" that the Garland County school districts engaged in intentional discrimination. HSSD's "belief" is nothing more than a generalized assertion of past intentional racial discrimination. There is no shortage of historical examples of intentional racial discrimination in the annals of Arkansas history, but those episodes cannot serve as a compelling interest to support the racial classification system perpetuated by the Settlement Agreement today in Garland County schools.

In *City of Richmond v. J.A. Croson Co*., 480 U.S. 469 (1989), the Supreme Court addressed an affirmative action set-aside program in the City of Richmond for the award of city construction contracts. On the question of past discrimination, the Supreme Court stated:

> While there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia. Like the claim that discrimination in primary and secondary schooling justifies a rigid racial preference in medical school admissions, past discrimination in a particular industry cannot justify the use of an unyielding racial quota.

480 U.S. at 499. Similarly, the sorry history of intentional racial discrimination in public schools and other areas of public life and society in Arkansas cannot justify the continued use of a racial classification with respect to interdistrict transfers in

Appellate Case: 15-1919   Page: 35   Date Filed: 06/24/2015 Entry ID: 4288508

Garland County. This unfortunately perpetuates the very evil that the Settlement Agreement purportedly sought to cure.

The history of intentional racial discrimination in Arkansas cannot be used to justify the denial of transfer to Garland County schoolchildren unless there is "the most exact connection," 551 U.S. at 720, between that sorry history and the school districts' current use of children's race to deny the transfer applications. The factual record here does not support any such "exact connection."

Furthermore, a federal court has broad equitable power to devise a desegregation remedy, but the nature of the remedy is determined by the nature and scope of the violation. *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 778 F.2d 404, 433 (8th Cir. 1985) (en banc). Before a court may impose an interdistrict desegregation remedy, it must find an interdistrict constitutional violation. The Supreme Court has explained this prerequisite:

> Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.

*Milliken*, 418 U.S. at 744–45. Similarly, in determining the merits of a Rule 60(b)(5) motion, the district court must "ascertain whether ongoing enforcement of the original order was supported by an ongoing violation of federal law." *Horne*,

27

557 U.S. at 454–456. The legal justification for displacement of local authority by an injunctive decree in a school-desegregation case is a finding that local authorities have violated the Constitution. *Dowell*, 498 U.S. at 248.

Here, the district court has never found any constitutional violations by the any of the school districts, and certainly none continuing into 2014. The original complaint alleged discrimination based on Garland County's past history of maintaining separate schools for black students. J.A. 5–7, 83–84. Both the original complaint and the class action complaint stated that Garland County schools had been required to—and did—integrate, but that six of the school districts remained predominately white. J.A. 7, 84–85. In their subsequent answers, motions, and other pleadings, none of the school districts admitted any constitutional violation. The district court never made any factual findings that the school districts had engaged in discriminatory practices. There was no finding or conclusion of illegal segregation, no determination of any necessary remedy, and no evaluation of the scope or limits of an interdistrict remedy. Instead, in 1992 the district court simply accepted the Settlement Agreement, endorsed it by Consent Decree, and installed a race-based transfer system that remains to this day, without any legal justification in the form of a finding of fact or conclusion of law that new race discrimination is necessary to remedy old race discrimination.

Yet, to support its wrong-headed unitary-status-directed conclusion that the

Districts "have not submitted any evidence to demonstrate full compliance with the Agreement, nor have they offered any proof that the vestiges of past discrimination have been eliminated," the district court expressly considered that "Hot Springs School District has provided evidence that the Garland County school districts remain racially identifiable." Add. 6. By doing so, the district court contravened the Supreme Court's numerous holdings that racial balancing for its own sake violates the Equal Protection Clause.

Governmental orchestration of racial balance for its own sake "is patently unconstitutional." *Grutter v. Bollinger*, 539 U.S. 306, 330 (2003). Chief Justice Roberts described the achievement of racial balance for its own sake as "a fatal flaw under our existing precedent." *Parents Involved*, 551 U.S. at 729–30 (Roberts, C.J., plurality). The roots of this rule trace back at least to 1971, where the Supreme Court observed:

> If we were to read the holding of the District Court to require, as a matter of substantive constitutional right, any particular degree of racial balance or mixing, that approach would be disapproved and we would be obliged to reverse. The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 24 (1971); *see also Milliken v. Bradley*, 433 U.S. 267, 280 n.14 (1977) (explaining that an order contemplating a constitutional right to a particular degree of racial balance or mix

29

would be infirm as a matter of law). Even *Freeman*—the decision that the district court erroneously relied upon—explained that racial imbalances are "not tantamount to a showing that the school district was in noncompliance with the decree or with its duties under the law" and that "[r]acial balance is not to be achieved for its own sake." *Freeman*, 503 U.S. at 494.

Furthermore, evidence of racial balance contributes little to the question of whether particular discrimination based on race satisfies strict scrutiny. The Supreme Court has recognized that the racial makeup of a school may stem from other sources, such as racially identifiable housing patterns. *Parents Involved*, 551 U.S. at 731 (Roberts, C.J., plurality); *Freeman*, 503 U.S. at 494–95. Additionally, the evidence in question consisted of comparison tables that presented the Garland County school districts' enrollment by race for the school years 2004–05, 2010–11, 2011–12, 2012–13, and 2013–14 and the Arkansas Department of Education's Public School Choice Act of 2013 Net/Gain Loss Report. J.A. 277–83. But these tables and the data included in them, viewed in a vacuum, provide evidence of nothing more than demographic information without context. None of this "evidence" beginning with 2004 data compensates for the complete lack of evidence, findings, or conclusions in 1989 of a constitutional violation requiring a constitutional remedy. Rather, the district court improperly adopted the very type of racial balancing for racial balancing's sake that the Supreme Court prohibits.

30

*See, e.g.*, *Freeman*, 503 U.S. at 494. Finally, if the schools remain racially identifiable in 2014, it simply points out that the Settlement Agreement has apparently been ineffective, which is yet another reason for termination and certainly does not support ongoing race discrimination.

Consequently, not only was the district court's reliance on evidence of racial identifiability logically infirm, it violated Supreme Court precedent—particularly the Supreme Court precedent that it erroneously used as the standard for this Rule 60(b)(5) motion. The district court erred in relying on such evidence.

### 2. *Student Diversity*

"The second government interest we have recognized as compelling for purposes of strict scrutiny is the interest in diversity in higher education upheld in *Grutter*, 539 U.S. at 328." *Parents Involved*, 551 U.S. at 722. However, the Supreme Court made clear in *Parents Involved* that the interest in diversity in higher education cannot justify race-based decisions affecting elementary and secondary public school students. 551 U.S. at 724–25. Similarly, this case is "not governed by *Grutter*" or its progeny. *Id.* As a result, this Court is not permitted to consider an interest in diversity in higher education as a compelling interest for racial classifications affecting the schoolchildren here. *Id.* at 726.

31

ii.    Narrow Tailoring

Even if there were a compelling interest to continue using the racial classification system in the Settlement Agreement, the system does not have the precise fit necessary to meet the narrow tailoring requirement. To pass constitutional muster, the race-based limitation on interdistrict transfers under the Settlement Agreement must be "necessary to achieve their stated ends." *Parents Involved*, 551 U.S. at 733. Refusing to permit children to transfer on the basis of their race cannot be justified as a necessary means to any legitimate end. The racial classification system is not narrowly tailored within the requirements of strict scrutiny analysis.

Judge Dawson reached this conclusion when he applied the narrow tailoring requirement to the 1989 Act in *Teague*. 873 F. Supp. 2d at 1066–68. Judge Dawson determined that the 1989 Act created a "blanket rule" on interdistrict transfers based solely on percentages of minority students in a school district and was directed only to racial balance. *Teague*, 873 F. Supp. 2d at 1066. Judge Dawson explained:

> To meet the definition of narrowly tailored, a school-choice plan must allow for an individualized review of each student to determine if his or her transfer would contribute to the overall goal of the district. A decision to deny transfer cannot be based solely on a student's race and must have consideration of their individual circumstances, otherwise the plan is unconstitutional.

32

*Id*. at 1067. Surprisingly, Judge Dawson did not engage in or refer to this analysis in this case. In fact, the Order below never mentions whether the 1989 Act, incorporated into the Settlement Agreement and made mandatory for the Garland County school districts, is constitutionally sound.

This Court ultimately vacated Judge Dawson's opinion as moot due to the repeal of the 1989 Act upon enactment of the 2013 Act. *Teague v. Cooper*, 720 F.3d 973, 976 (8th Cir. 2013) ("When a law has been amended or repealed, actions seeking declaratory or injunctive relief for earlier versions are generally moot."). While it did not address the merits of the parties' arguments or Judge Dawson's opinion, the Eighth Circuit wrote favorably of the Arkansas General Assembly's "intent to move away from this constitutionally sensitive issue so as to preserve the benefits of school choice." *Id*. at 978.

To satisfy the narrow tailoring requirement, the proponent of race discrimination would have to show that other methods were considered and rejected before determining that the racial classification requirement of the Settlement Agreement served the parties' stated goal to provide a "quality education for all children of Garland County." J.A. 125. If the school districts can make transfer decisions without considering race (and they can), then the validity of the racial classification system in the Settlement Agreement fails under the

33

narrow-tailoring requirement. Justice Kennedy explained this burden in *Parents Involved*:

> And the inquiry into less restrictive alternatives demanded by the narrow tailoring analysis requires in many cases a thorough understanding of how a plan works. The government bears the burden of justifying its use of individual racial classifications. As part of that burden it must establish, in detail, how decisions based on an individual student's race are made in a challenged governmental program.

551 U.S. at 783–84 (Kennedy, J., concurring). Certainly, several alternatives are available to the school districts to achieve the goal of providing a "quality education for all children in Garland County" outside of utilizing a racial classification system to screen transfer students. The 2013 Act shows that interdistrict student transfers to enhance the quality of education may occur without a race-based criterion.

For whatever reasons, in 1992 the district court and the school districts agreed, without any evidence, finding, or conclusion of a constitutional violation, to adopt the 1989 Act to consider race in whether to allow children to transfer among school districts in Garland County. The district court's stamp of approval should be removed given changes in constitutional law and the repeal of the 1989 Act since then. Continued federal enforcement of racial discrimination in Garland County's public schools is inequitable and should cease.

34

## CONCLUSION

For these reasons, the Districts respectfully request that this Court reverse the district court's Order denying the Districts' Rule 60(b)(5) motion and remand with instructions that the district court terminate the Settlement Agreement and the Order that adopted it.

Respectfully submitted,

KUTAK ROCK LLP
124 West Capitol Avenue, Suite 2000
Little Rock, Arkansas 72201
Telephone: (501) 975-3000
Facsimile: (501) 975-3001

By: /s/ Jess Askew III
    Jess Askew III, Ark. Bar No. 86005
    Jess.Askew@kutakrock.com
    Ashley W. Hudson, Ark. Bar 2007136
    Ashley.Hudson@kutakrock.com

    AND

    D. Scott Hickam
    D. Scott Hickam, P.A.
    211 Hobson Avenue, Suite C
    Hot Springs, AR 72913
    dscotthickam@sbcglobal.net

*Attorneys for Appellants Cutter Morning Star School District, Fountain Lake School District, Jessieville School District, Lake Hamilton School District, Lakeside School District and Mountain Pine School District*

35

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type and volume limitations of Rule 32(a)(7)(B). It contains 9,058 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). Pursuant to Eighth Cir. R. 28A(h), the electronic version of the brief is in PDF format, and was generated by printing to Adobe PDF from the original word processing file. The brief and addendum have been scanned for viruses and are virus-free.

/s/ Jess Askew III
Jess Askew III

Appellate Case: 15-1919    Page: 45    Date Filed: 06/24/2015 Entry ID: 4288508

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on June 22, 2015, I have served a true and correct paper copy of the Brief of Appellants, by first-class U.S. Mail, postage prepaid, to counsel for each separately-represented party through their counsel of record as follows:

Q. Byrum Hurst , Jr.
Justin Byrum Hurst
HURST LAW GROUP
518 Ouachita Avenue
Hot Springs, AR 71901-1197

Allen P. Roberts
Attorney at Law
P.O. Box 280
Camden, AR 71701

Whitney F. Moore
FUQUA CAMPBELL P.A.
Riviera Tower
3700 Cantrell Road, Suite 205
Little Rock, AR 72202

Rosalyn Middleton
Arkansas Attorney General
323 Center, Suite 200
Little Rock, AR 72201

Jeremy C. Lasiter
General Counsel
Arkansas Department of Education
Four Capitol Mall, Room 404A
Little Rock, AR 72201

D. Scott Hickam
D. SCOTT HICKAM, P.A.
211 Hobson Avenue, Suite C
Hot Springs, AR 71913

/s/ Jess Askew III
Jess Askew III

37