No. 15-1919

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

W.T. Davis, et al.                                    Plaintiffs-Appellees

v.                              No. 15-1919

Hot Springs School District, the
State of Arkansas, and the Arkansas
State Board of Education                         Defendants-Appellees

Cutter Morning Star School District,
Fountain Lake School District,
Jessieville School District, Lake
Hamilton School District, Lakeside
School District, and Mountain Pine
School District                          Defendants-Appellants

---

## BRIEF OF THE HOT SPRINGS SCHOOL DISTRICT DEFENDANT-
## APPELLEE AND THE PLAINTIFFS-APPELLEES

---

Allen P. Roberts (Ark. Bar No. 64036)      Q. Byrum Hurst (Ark. Bar No. 74082)
ALLEN P. ROBERTS, P.A.                      Justin Hurst (Ark. Bar No. 2005021)
1315 Main Street                           Hurst Law Group
Camden, Arkansas 71711                     518 Ouachita Avenue
Telephone: (870) 836-5310                  Hot Springs, Arkansas 71901
Facsimile: (870) 836-9662                  Telephone: (501) 623-2565
                                           Facsimile: (501) 623-9391

Whitney F. Moore (Ark. Bar No. 2009193)
FUQUA CAMPBELL, P.A.                        Counsel for the Plaintiffs-Appellees
3700 Cantrell Road, Suite 205
Little Rock, Arkansas 72202
Telephone: (501) 374-0200
Facsimile: (501) 975-7153


Counsel for Hot Springs School District

# SUMMARY OF THE CASE

The Appellants – six "racially identifiable" school districts – ask to be released from a Settlement Agreement properly characterized as a "consent desegregation plan of the Court." Order at 5, J.A. 210. They have not shown that they have attained unitary status, averring instead that this case "implicates a district court's resolution of a Rule 60(b)(5) motion based on a significant change in law" and that "the district court erred in failing to apply a more flexible standard than this Court recently found applicable under these circumstances." Appellants' Brief at i. They are wrong. The District Court applied the proper standard and reached the correct result. The Appellants focus exclusively on law governing voluntary government decisions to adopt statewide race-based decision making criteria in a non-remedial context. But this case is about a "federal desegregation mandate[] . . . which is subject to a very different analysis," *Teague v. Cooper*, 720 F.3d 973, 977 n. 2 (8th Cir. 2013), given that "no one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies." *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 701, 737 (2007).

This case raises no "serious . . . issues of a constitutional magnitude." Appellants' Brief at i. Oral argument is neither necessary nor appropriate.

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE........................................................................i

TABLE OF CONTENTS........................................................................ii

TABLE OF AUTHORITIES........................................................................iii

STATEMENT OF THE ISSUES........................................................................vii

STATEMENT OF THE CASE........................................................................1

SUMMARY OF THE ARGUMENT........................................................................7

ARGUMENT........................................................................11

I.      The District Court Applied the Correct Legal Standard
When It Held that the Request for Complete Termination
of the Settlement Agreement Should Be Denied..................................11

II.     The Law Governing Race Conscious Remedies Governs
and Has Not Changed........................................................................15

III.    Public Policy Supports the Settlement Agreement ............................................29

IV.    The Operative Facts Do Not Support the Claims of
"Changed Circumstances" or Judicially Cognizable
"Inequities"........................................................................32

CONCLUSION........................................................................40

CERTIFICATE OF COMPLIANCE........................................................................42

CERTIFICATE OF SERVICE........................................................................43

Appellate Case: 15-1919    Page: 3    Date Filed: 09/01/2015 Entry ID: 4311995

# TABLE OF AUTHORITIES

## Cases

*Adarand Constructors v. Pena*,
515 U.S. 200 (1995)........................................................................18

*Alexander v. Britt*,
89 F.3d 194 (4th Cir. 1996)..........................................................14

*Anastasoff v. United States*,
235 F.3d 1054 (8th Cir. 2000)......................................................26

*Board of Education of Oklahoma City Public Schools v. Dowell*,
498 U.S. 237 (1991)................................................................14, 15

*City of Richmond v. J. A. Croson Co.*,
488 U.S. 469 (1989)................................................................17, 23

*Coca-Cola Co. v. M.R. S. Distributors*,
224 Fed. Appx. 646 (9th Cir. 2007)............................................14

*Columbus Board of Education v. Penick*,
443 U.S. 449 (1979)........................................................................23

*Gratz v. Bollinger*,
539 U.S. 246 (2003)................................................................17, 23

*Grutter v. Bollinger*,
539 U.S. 306 (2003)..........................................................17, 19, 23

*Hewitt v. Helms*,
482 U.S. 755 (1987)........................................................................30

*Horne v. Flores*,
557 U.S. 433 (2009)..........................................................11, 12, 31

Appellate Case: 15-1919     Page: 4     Date Filed: 09/01/2015 Entry ID: 4311995

*Little Rock School District v. Pulaski County Special School District*,
921 F.2d 1371 (8th Cir. 1990)...........................................................24, 30, 31

*Little Rock School District v. Pulaski County Special School District, # 1*,
56 F.3d 904 (8th Cir. 1995)...........................................................31

*Little Rock School District v. State of Arkansas*,
127 F.3d 693 (8th Cir. 1997)...........................................................30

*Metro Broadcasting, Inc. v. Federal Communications Commission*,
497 U.S. 547 (1990)...........................................................18

*Milliken v. Bradley*,
418 U.S. 717 (1974)...........................................................34

*Parents Involved in Community Schools v. Seattle School District No. 1*,
551 U.S. 703 (2007)...........................................................*passim*

*Protectoseal Co. v. Barancik*,
23 F.3d 1184 (7th Cir. 1994)...........................................................14

*Raney v. Board of Education of the Gould School District*,
391 U.S. 443 (1968)...........................................................3

*Rufo v. Inmates of Suffolk County Jail*,
557 U.S. 367 (1992)...........................................................11, 12, 13, 14, 15, 31

*Smith v. Board of Education of the Palestine-Wheatley School District*,
769 F.3d 566 (8th Cir. 2014)...........................................................*passim*

*Swann v. Charlotte-Mecklenburg Board of Education*,
402 U.S. 1 (1971)...........................................................22, 23

*Teague ex rel. T. T. v. Arkansas Board of Education*,
873 F. Supp. 2d 1055 (W.D. Ark. 2012)...........................................................5, 6, 21, 26

iv

*Teague v. Cooper*,
720 F.3d 973 (8th Cir. 2013)...............................................................9, 20, 25

*United States v. Paradise*,
480 U.S. 149 (1987)................................................................................9, 22, 23

*Wygant v. Jackson Board of Education*,
476 U.S. 267 (1986)........................................................................................17

**Statutes**

42 U.S.C. § 1988(b).........................................................................................30

Arkansas Opportunity Public School Choice Act of 2004,
ARK. CODE ANN. § 6-18-227............................................................................35

Arkansas Public School Choice Act of 1989,
ARK. CODE ANN. § 6-18-206.....................................................................*passim*

ARK. CODE ANN. § 6-18-202.............................................................................38

ARK. CODE ANN. § 6-18-205.............................................................................39

ARK. CODE ANN. § 6-18-208 ............................................................................38

ARK. CODE ANN. § 6-18-316.............................................................................35

ARK. CODE ANN. § 6-18-317.............................................................................35

ARK. CODE ANN. § 6-18-907.............................................................................36

Public School Choice Act of 2013,
ARK. CODE ANN. §§ 6-18-1901 et seq......................................................20, 21

v

## Other Authorities

JEFFREY R. HENIG, RETHINKING SCHOOL CHOICE: LIMITS OF
    THE MARKET METAPHOR (Princeton University Press, 1994)....................3-4

Public School Choice Act of 2013 Net Gain/Loss Report...............................36, 37

Appellate Case: 15-1919     Page: 7     Date Filed: 09/01/2015 Entry ID: 4311995

## STATEMENT OF THE ISSUES

I.    THE DISTRICT COURT APPLIED THE CORRECT LEGAL STANDARD WHEN IT HELD THAT THE REQUEST FOR COMPLETE TERMINATION OF THE SETTLEMENT AGREEMENT SHOULD BE DENIED.

        *Smith v. Board of Education of Palestine-Wheatley School District*, 769 F.3d 566 (8th Cir. 2014).

II.    THE LAW GOVERNING RACE CONSCIOUS REMEDIES GOVERNS AND HAS NOT CHANGED

    A.    The Supreme Court Has Not Changed the Basic Constitutional Doctrines

        *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 703 (2007).

        *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989).

    B.    The Rules of Law Invoked by the Appellants Do Not Apply in this Case

        *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 703 (2007).

        *Teague v. Cooper*, 720 F. 3d 973 (8th Cir. 2013).

        *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1 (1971).

        *Smith v. Board of Education of Palestine-Wheatley School District*, 769 F.3d 566 (8th Cir. 2014).

    C.    The District Court Decision in *Teague* Has Neither Force Nor Bearing in This Case

        *Anastasoff v. United States*, 235 F.3d 1054 (8th Cir. 2000).

Appellate Case: 15-1919    Page: 8    Date Filed: 09/01/2015 Entry ID: 4311995

*Smith v. Board of Education of Palestine-Wheatley School District*, 769 F.3d 566 (8th Cir. 2014).

III.    PUBLIC POLICY SUPPORTS THE SETTLEMENT AGREEMENT

*Little Rock School District v. Pulaski County Special School District*, 921 F.2d 1371 (8th Cir. 1990).

IV.    THE OPERATIVE FACTS DO NOT SUPPORT THE CLAIMS OF "CHANGED CIRCUMSTANCES" OR JUDICIALLY COGNIZABLE "INEQUITIES"

*Smith v. Board of Education of Palestine-Wheatley School District*, 769 F.3d 566 (8th Cir. 2014).

*Milliken v. Bradley*, 418 U.S. 717 (1974).

ARK. CODE ANN. § 6-18-307.

Appellate Case: 15-1919    Page: 9    Date Filed: 09/01/2015 Entry ID: 4311995

## STATEMENT OF THE CASE

The Statement of the Case offered by the Appellants is an artful blend of facts and omissions. This litigation did begin when Appellee W. T. Davis, "Individually, and on Behalf of a Class of Taxpayers of Garland County, Arkansas" and the Garland County Chapter of the NAACP, filed the cause of action on August 18, 1989. Complaint, J.A. 1. The Complaint alleged that "[f]or many years Garland County maintained or condoned a racially segregated structure of public education under color of state law." *Id.* ¶ 17, J.A. 5. That is what the plaintiffs in this case "believed, and were *prepared to prove*" when they initiated this litigation. Hot Springs School District's Brief in Opposition to Motion for Relief from Judgment at 2, J.A. 252 (emphasis added) ("HSSD Opposition").

In particular, the Complaint stressed that "the school districts in Garland County, Arkansas, other than the Hot Springs School District, are predominantly white." Complaint, ¶ 21, J.A. 7. Most of the original defendants filed rote denials. *See, e.g.*, Separate Answer of Defendant, Lakeside School District ¶ 21 ("This Defendant denies the allegations of paragraph 21 of the Plaintiffs' Complaint."); Separate Answer of Defendant Mountain Pine School District ¶ 21, J.A. 29 ("denies the allegations made in Paragraph 21 as those allegations are intended to be made against it"). Two, recognizing that the numbers said otherwise as to the pertinent

-1-

point, did not.  *See* Separate Answer of Defendant, Cutter Morning Star School District ¶ 8, J.A. 15 ("admits its student population is predominantly white"); Separate Answer of Lake Hamilton School District ¶ 21, J.A. 59 ("[a]dmits that it is a predominantly white school district").  The HSSD, Appellee in this iteration of the case, in turn responded consistent with the reality that in 1989 it was the only school district in Garland County with a meaningful number of minority students.  *See* Answer of Separate Defendant Hot Springs School District No. 6, ¶ 21, J.A. 52 ("this separate school district admits it is fully integrated").

In 1991, the parties entered into the Garland County School Desegregation Case Comprehensive Settlement Agreement ("Settlement Agreement"), J.A. 173-90. That Agreement was approved by the District Court after a fairness hearing, with the Court emphasizing that it "is fair and reasonable [and] affords appropriate relief to the plaintiff class."  Order and Memorandum at 2, J.A. 163.  The Settlement Agreement was negotiated by all of the parties and approved by the District Court on April 28, 1992.  Order and Memorandum, J.A. 162-65.  As part of that process, the parties prepared and submitted a Memorandum of the Parties in Support of the Comprehensive Garland County School Desegregation Settlement, J.A. 151-61 ("Joint Memorandum").  It stressed that "[t]he parties engaged in sufficient discovery to enable them to assess the strengths and weaknesses of the claims presented by the

-2-

plaintiff class." *Id.* at 1-2, J.A. 151-52.  It also stressed that "[a]lthough liability, if any, has not been litigated in this case, the parties have nevertheless agreed to a comprehensive settlement agreement, which provides *significant relief for the plaintiff class*." *Id.* at 2, J.A. 152 (emphasis added).

Part of that relief was the inclusion of the Arkansas Public School Choice Act of 1989 ("1989 Act"), "an otherwise voluntary program to which the defendants now bind themselves." *Id.*  The parties' incorporation of the 1989 Act into the Settlement Agreement was an effort to address student assignment and transfers between the districts.  The inclusion of the 1989 Act reflected one key aspect of the original complaint: the reality that prior to the passage of the 1989 Act "Arkansas had . . . a number of state laws which permitted and [in] effect supported the transfer of . . . black children from one district to another to maintain a segregated public education program."  Complaint, ¶ 18, J.A. 6.[1]  The 1989 Act, the parties believed, "will

_____

[1]  For perspectives on how school choice operated in Arkansas, see *Raney v. Board of Education of the Gould School District*, 391 U.S. 443 (1968), in which the Court noted that under the prior regime

> [n]ot a single white child has sought to enroll in the all-Negro Field Schools, and although some 80 to 85 Negro children were enrolled in the Gould schools in 1967, over 85% of the Negro children in the system still attend the all-Negro Field Schools.

*Id.* at 446.  *See generally* JEFFREY R. HENIG, RETHINKING SCHOOL CHOICE: LIMITS OF THE MARKET METAPHOR, at 103 (Princeton University Press, 1994) ( "When direct

-3-

facilitate the voluntary movement of minority students from the Hot Springs School District to any other district in the county and will, in turn, permit the transfer of any majority students from any other Garland County District to the Hot Springs School District." Joint Memorandum at 2-3, J.A. 152-53. Put simply, key provisions of the 1989 Act allowed for integrative transfers but prohibited those with a segregative effect, i.e., a student could transfer to a school with a lower percentage enrollment of students of his race than his resident district but not to a school with a higher percentage enrollment.

Twenty-six years later key facts that impelled this litigation have not changed. That reality informed the District Court's rejection of the Appellants' Rule 60(b)(5) Motion. *See* Memorandum Opinion and Order at 6, J.A. 308 (movants "have [not] offered any proof that the vestiges of past discrimination have been eliminated"); *id.* at n. 5 ("Defendant Hot Springs School District has provided evidence that the Garland County school districts remain racially identifiable."). The Appellants, which comprise six of the seven districts in Garland County, remain predominantly white, while Appellee Hot Springs School District ("HSSD"), enrolls the majority of the County's black students.

The Appellants characterize the situation as one within which "*de jure* racism

resistance failed, freedom of choice was the fallback position.").

Appellate Case: 15-1919    Page: 13    Date Filed: 09/01/2015 Entry ID: 4311995

in public secondary schools" is being "mandate[d] and enforce[d]" by the District Court.  Appellants' Brief at 1.  Their focus is one provision of the 1989 Act, Ark. Code Ann. § 6-18-206(f)(1).  What the Appellants fail to mention is that the decision to incorporate the *entire* 1989 Act into the Settlement Agreement reflected a key element of the original Complaint:  the existence of "a number of state laws which permitted and [in] effect supported the transfer of . . . black children from one school district to another to maintain a segregated public education program."  Complaint, ¶ 18, J.A. 6.  They further fail to mention that the District Court expressly recognized that "§ 6-18-206(f) was inserted in [the 1989 Act] in response to and in light of" the reality highlighted in the Complaint, "this state's discrimination in its public K-12 educational programs."  *Teague ex rel. T. T. v. Arkansas Board of Education*, 873 F. Supp. 2d 1055, 1064 (W.D. Ark. 2012), *vacated and dismissed*, *Teague v. Cooper*, 720 F.3d 973 (8th Cir. 2013).

As the District Court stressed, the 1989 Act was passed in the light of the fact that "a student transfer law that does not control for potential segregative effects is unconstitutional." *Teague*, 873 F. Supp. 2d at 1064 (citing *Little Rock School District v. Pulaski County Special School District No. 1, et al.*, 584 F. Supp 328 (E.D. Ark. 1984); 597 F. Supp. 1220 (E.D. Ark. 1984; 778 F.2d 404 (8th Cir. 1985 (en banc)). The goal, the Court observed, was "to permit student transfer . . . so long as those

-5-

transfers do not adversely affect the desegregation of either district." *Teague*, 873 F. Supp. 2d at 1069.

The Appellants ignore the fact that they agreed that the 1989 Act should be incorporated into the Settlement Agreement in order to "facilitate the movement of students, both black and white, who desire to avail themselves of the diverse educational offerings offered by the respective school districts in Garland County." Settlement Agreement at 2, J.A. 126. They also fail to acknowledge the realities that follow from their own prior position in this litigation, that the Settlement Agreement is "a consent desegregation plan of the Court," Petition for Declaratory Relief, ¶17(b), J.A. 171, and that "neither the judicial decision declaring the 1989 Act unconstitutional . . . nor the repeal of the 1989 Act . . . have any impact *per se* on the efficacy of the Court's desegregation order of April 28, 1992." *Id.* ¶ 17(c), J.A. 171.

Finally, the Appellants note correctly that § 6-18-206(f)(1) was the basis for denying the request by Ms. Latisha Walker that her three children be allowed to transfer to the Mountain Pine School District. Appellants' Brief at 5-6. They characterize this situation as "unjust," but fail to mention or account for the reality that the Walker family had available to them, and failed to explore, numerous other transfer options that were not subject to the race-based limitation about which they complain.

-6-

The evidence presented to the District Court shows that the enrollment profiles of the seven Garland County school districts have not changed. Six of the seven – the Appellants here – remain overwhelmingly white. Only one, Appellee HSSD, has any significant minority enrollment. *See* Exhibit 1 at 2, J.A. 278. As the Court stressed, the "evidence [before it showed] that the Garland County school districts remain racially identifiable." Memorandum Opinion and Order at 6 n. 5, J.A. 309. That is, at this point in time, "the vestiges of past discrimination have [not] been eliminated." *Id.* at 6, J.A. 309.

### SUMMARY OF THE ARGUMENT

The District Court applied the correct legal standard to the request that was actually made below, which was to terminate the Settlement Agreement. As this Court made abundantly clear in the very decision on which the Appellants rely, the focus and approach in such cases should be precisely the one taken by the District Court. The moving parties must show that they "have fully complied with the Agreement." Memorandum Opinion and Order at 6, J.A. 309; *Smith v. Board of Education of the Palestine-Wheatley School District*, 769 F.3d 566, 571 (8th Cir. 2014) (noting the need to show "'full and satisfactory compliance with the decree'") (quoting *Freeman v. Pitts*, 503 U.S. 467, 491 (1992)). In particular, the moving party must demonstrate something the Appellants did not and cannot do: document that

-7-

"the vestiges of past discrimination have been eliminated." Memorandum and Order at 6, J.A. 309; *Smith*, 769 F.3d at 571.

Appellants focus exclusively on what they characterize as major changes in the law since the Settlement Agreement was negotiated and entered. In particular, they argue that *Parents Involved in Community Schools v. Seattle School District No. 1*, 551 U.S. 703 (2007), effected a "significant change[] in the law." Appellants' Brief at 21. That contention is incorrect. The portions of *Parents Involved* that they discuss did not change anything. Indeed, Chief Justice Roberts's plurality opinion emphasized that the rules in question were "well-established." *Parents Involved,* 551 U.S. at 720.

The reality the Appellants ignore is that the segments of *Parents Involved* that they find so telling focused on voluntary policy decisions. That is a fatal mistake, since that is not this case. This litigation, instead, is about the entirely different situation that arises when school districts accused of initiating or perpetuating intentional acts of segregation voluntarily agree to forego further litigation and impose specific restrictions on their actions in a "court-approved desegregation plan." Order at 4, J.A. 209. "[N]o one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies." *Parents Involved*, 551 U.S. at 737. "To remedy the wrong, school districts that had been segregated by

-8-

law had no choice, whether under court supervision or pursuant to voluntary desegregation efforts, but to resort to extraordinary measures including individual student and teacher assignment to schools based on race." *Id.* at 793-94 (Kennedy, J., concurring in part and concurring in the judgment).

The District Court's decision in *Teague* accordingly has no bearing on this case. The use of the race-conscious limit on school choice transfers articulated in former Ark. Code Ann. § 6-18-206(f)(1) and incorporated in the Settlement Agreement is entirely consistent with Supreme Court and Eighth Circuit precedent making it perfectly clear that the legal issues arising from court orders and court approved agreements are different from those that inhere to voluntary public policy choices. *See United States v. Paradise*, 480 U.S. 149, 190 n. 1 (1987) (Stevens, J., concurring) (fundamental difference between state policy decisions and district court decrees designed "to eliminate the consequences of the State's pervasive, systematic, and obstinate discriminatory conduct"); *Teague*, 720 F.3d at 977 n. 2 ("federal desegregation mandates . . . subject to a very different analysis").

Finally, the only factual "inequity" the Appellants can identify is Ms. Walker's request to move her children to the Mountain Pine School District. The District Court correctly held that "this single example" cannot "justi[fy] the termination of a settlement agreement that has been in place for decades." Memorandum Opinion and

Order at 6, J.A. 309. More to the point, as Appellee HSSD stressed before the Court below, any possible "inequities" conjured up by this episode are rendered illusory by the fact that the Walker family failed to explore a range of options available to them that would have allowed them to pursue the transfers they sought. HSSD Opposition at 22-23, J.A. 273-74.

-10-

**I.** **THE DISTRICT COURT APPLIED THE CORRECT LEGAL STANDARD WHEN IT HELD THAT THE REQUEST FOR COMPLETE TERMINATION OF THE SETTLEMENT AGREEMENT SHOULD BE DENIED.**

The Appellants make it quite clear that the heart of this appeal is, in fact, a "motion to *terminate* the settlement." Appellants' Brief at vii (emphasis added). They argue that the District Court used the wrong legal standard when it rejected their request, relying principally on two Supreme Court decisions, *Horne v. Flores*, 557 U.S. 433 (2009), and *Rufo v. Inmates of Suffolk County Jail*, 557 U.S. 367 (1992), and on this Court's decision in *Smith v. Board of Education of Palestine-Wheatley School District*, 769 F.3d 566 (8th Cir. 2014).

The Appellants do not argue, because they cannot, that the District Court failed to consider the guidance provided by *Horne*, *Rufo*, and *Smith*. The District Court quoted these decisions and laid out the operative principles from them. Memorandum Opinion and Order at 4-7, J.A. 307-09. In particular, Judge Dawson acknowledged that federal courts have "'substantial flexibility to adapt their decrees to changes in the facts or law, particularly in institutional reform litigation, where the public interest is paramount.'" *Id*. at 5, J.A. 308 (quoting *Smith*, 769 F.3d at 572).

The Appellants characterize the decision below as one in which the Court "relied on *Smith* in denying the [Appellants'] Rule 60(b)(5) motion but erroneously

Appellate Case: 15-1919   Page: 20   Date Filed: 09/01/2015 Entry ID: 4311995

employed the *Freeman* standard rather than *Rufo*." Appellants' Brief at 16. They further contend that "the district court ignored the basis for the Districts' petition for relief – significant changes in law – focusing instead on whether the surrounding factual circumstances merited relief from the Settlement Agreement based on 'full compliance' with its terms." *Id.* at 17.

The District Court did no such thing. It expressly acknowledged the guidance in *Horne* that Rule 60(b)(5) relief can be granted when there is "'a significant change in either factual conditions or in law.'" Memorandum Opinion and Order at 4, J.A. 307 (quoting *Horne*, 557 U.S. at 447). As Appellees make clear, *infra*, "[a]fter consideration of the record and arguments presented," Memorandum Opinion and Order at 6, J.A. 309, the District Court properly recognized (albeit did not expressly state) that there have in fact been absolutely no pertinent "significant changes in law" since the Settlement Agreement was entered. Judge Dawson focused, accordingly, on the only real issue before him: whether the Appellants had met the appropriate burden regarding "changes in fact."

As this Court made clear in *Smith*, the standard applied in assessing Rule 60(b)(5) motions varies, depending on whether the request is to simply modify a decree or agreement, or is instead one to completely terminate it. This Court noted that "[l]ess than three months" after *Rufo* the Supreme Court "decided *Freeman*,

-12-

reviewing the denial of a motion for final dismissal of a consent order." *Smith*, 769 F.3d at 571. It emphasized that, "[w]ithout even citing *Rufo*, the [Supreme] Court" held that a federal court confronted with a motion to terminate "should address 'whether the vestiges of past discrimination had been eliminated to the extent practicable.'" *Id.* at 571 (quoting *Freeman*, 503 U.S. at 492).

That is exactly what the District Court did. Judge Dawson looked carefully at the record and noted that the moving Districts "have not submitted any evidence to demonstrate full compliance with the Agreement, nor have they offered any proof that the vestiges of past discrimination have been eliminated." Memorandum and Order at 6, J.A. 309. That was not a departure from what this Court did in *Smith*. Rather, the District Court simply recognized that in *Smith* this Court repeatedly stressed that the motion in that case involved only an attempt to modify. *See Smith*, 769 F.3d at 570 ("Applying the standard for modification of a consent decree"); *id.* at 572 (distinguishing "modification of a decree" from "termination of an injunctive decree"; *id*. at 573 ("Modifying the decree"); *id* at 574 ("in approving that modification"). Emphasizing that "we are confident that the district court did not intend that its Order terminate the entire consent decree," *id.* at 574, this Court held that *Rufo* provided the correct standard and rejected the attempt by "[t]he Wheatley plaintiffs" to ignore "the significant differences between a petition to modify a consent decree on account of

-13-

changed circumstances, and a petition to terminate all or part of a consent decree because the party subject to the decree has *fully* complied with *all* of its obligations." *Id.* at 572 (emphasis added).

It may or may not be true that decisions in other circuits "have determined that application of the *Rufo* standard does not depend on whether the movant seeks modification or termination of an inequitable decree." Appellants' Brief at 18. The Appellants cite three cases. In the first, *Coca-Cola Co. v. M.R. S. Distributors*, 224 Fed. Appx. 646 (9th Cir. 2007), the court did not actually discuss the distinction, but instead found "abuse of discretion" when "the district court failed to articulate a reasoned basis for its decision." *Id.* at 646. The second, *Protectoseal Co. v. Barancik*, 23 F.3d 1184 (7th Cir. 1994), involved an injunction, rather than a consent decree or agreement. Moreover, it focused on "'change in law authoriz[ing] what had previously been forbidden,'" *id.* at 1187 (quoting *American Horse Protection Ass'n v. Watt*, 694 F.2d 1310, 1316 (D.C. Cir. 1982), which presents a fundamentally different set of circumstances from those found here.

In only one, *Alexander v. Britt*, 89 F.3d 194 (4th Cir. 1996), does the court engage in a meaningful comparison, albeit one between *Rufo* and *Board of Education of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237 (1991), which predates *Freeman*. Tellingly, it emphasized "that *Dowell* and *Rufo* are entirely consistent" and

-14-

"do, indeed, sound the 'same themes.'" *Id.* at 199 (quoting *Rufo*, 502 U.S. at 380).

And, it observed, the operative framework is one within which "[n]othing in *Dowell*

or *Rufo* indicates that the Supreme Court intended the *Rufo* standard to apply to *all*

modification motions and the *Dowell* standard to *all* termination motions."  *Id.*

Regardless, *Smith* itself repeatedly draws that distinction.  *Smith*, unlike this

case, involved only a motion for modification.  The Appellants seek termination.  For

this reason alone, the Appellants are misguided when they invoke *Smith* as their

savior.

## II.   THE LAW GOVERNING RACE CONSCIOUS REMEDIES GOVERNS AND HAS NOT CHANGED

The Appellants' predicate their Rule 60(b)(5) motion on repeated contentions

that there have been "significant changes in law" since the Settlement Agreement was

entered.  *See, e.g.,* Appellants' Brief at i; 10; 17.  Indeed, they criticize the District

Court for "never look[ing] at the[] equities" posed by or "analyz[ing] the effects of"

their principal guideposts here:  the Supreme Court's decision in *Parents Involved*,

the District Court's decision in *Teague*, and the related determination by the Arkansas

General Assembly to repeal the 1989 Act.  There was in fact no need for the District

Court to do so, because none of these actually involved any "change in law" that is

pertinent in this particular case.

-15-

### A. The Supreme Court Has Not Changed the Basic Constitutional Doctrines

The Settlement Agreement was agreed to by the parties in October, 1991, *see* Garland County School Desegregation Case Comprehensive Settlement Agreement at 16-17, J.A. 188-89, and approved by the District Court on April 28, 1992. *See* Order and Memorandum at 4, J.A. 165. This obviously predates *Parents Involved* and the other Supreme Court decisions Appellants cite and discuss as part of their argument that "legal *changes*" have somehow made "prospective enforcement inequitable." Appellants' Brief at 23 (emphasis added).

While it is true that each of the decisions on which they rely were handed down after the Settlement Agreement was negotiated and accepted by the District Court, there is absolutely nothing in any of these decisions that "changed" the operative law. Indeed, the Appellants sow the seeds of their own destruction when they quote the observation by Chief Justice Roberts in *Parents Involved* that the general constitutional principles were "well established" when that opinion was handed down. Appellants' Brief at 23 (quoting *Parents Involved*, 551 U.S. at 701). *See also id*. at 21 (waxing eloquent about "the fundamental, constitutional inequity of using a child's race to determine where he or she may attend public school, an equal protection abomination that has been condemned since *Brown v. Board of Education*

-16-

in 1954").

The operative standard, then and now, is that classifications invoking race are "suspect" and will be sustained only when they are motivated by a "compelling" justification and the means selected to implement them are "narrowly tailored." *See, e.g., Parents Involved*, 551 U.S. at 720 ("when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny"). That has been the rule since well before the Settlement Agreement was negotiated. *See, e.g., City of Richmond v. J. A. Croson Co.*, 488 U.S. 469, 493-94 (1989) (discussing the need for and goals of strict scrutiny); *Wygant v. Jackson Board of Education*, 476 U.S. 267, 273-74 (1986) (noting the strict scrutiny rule and its two components). None of the cases Appellant discusses did anything new, and all expressly acknowledged that. *See, e.g., Grutter v. Bollnger*, 539 U.S. 306, 326 (2003) ("We have held that all racial classifications" are subject to "strict scrutiny."); *Gratz v. Bollinger*, 539 U.S. 246, 270 (2003) (characterizing that rule as "by now well established").[2] There have been no changes in core constitutional

_____

[2] To the extent that *Grutter* did anything of note, its conclusion that institutions of higher education have "a compelling interest in attaining student body diversity," *Grutter*, 539 U.S. at 328, was couched as an "endorsement [of] Justice Powell's view in [*Regents of the University of California v. Bakke*, 438 U.S. 265 (1978)] that student body diversity is a compelling state interest that can justify the use of race in university admissions." *Id.* at 325.

Appellate Case: 15-1919     Page: 26     Date Filed: 09/01/2015  Entry ID: 4311995

principles since 1992.[3]

## B.  THE RULES OF LAW INVOKED BY THE APPELLANTS DO NOT APPLY IN THIS CASE

The one slender reed available to Appellants is a post-Settlement Agreement determination by the Supreme Court that two school districts could not "den[y] assignment to particular schools . . . solely because of . . . race." *Parents Involved*, 551 U.S. at 710-11.  The Appellants devote considerable time and energy to their attempts to characterize the holding in that case as an "important legal ruling[]" that condemns "race-based student assignments in public schools."  Appellants' Brief at 19.  What they fail to recognize or admit is that the passages from *Parents Involved* that they quote and discuss have no bearing here, while others that they ignore do, albeit to their detriment.

The question before the Supreme Court was "whether a public school that had not operated legally segregated schools or has been found to be unitary may choose

---

[3]  Admittedly, one element of the constitutional framework has changed. *Compare Metro Broadcasting, Inc. v. Federal Communications Commission*, 497 U.S. 547, 565-66 (1990) ("a benign racial classification employed by Congress" would be subjected to "intermediate scrutiny," requiring only an "important" interest and a "substantial relationship"), *with Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995) (holding that "all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny").  But that "development in the law" has no bearing where, as here, the focus is on the actions of state and local government, not those of Congress.

-18-

to classify students by race and rely on that classification in making school assignments." *Parents Involved*, 551 U.S. at 711. As part of its discussion, the Court stressed that one of the districts in question, Seattle School District No. 1, "has never operated segregated schools – legally separate schools for students of different races – nor has it ever been subject to court-ordered desegregation." *Id*. at 712. And it noted that the second, the Jefferson County Public Schools in Louisville, Kentucky had "maintained a segregated school system" but that the federal court decree entered in that case had been "dissolved . . . after [a] finding that the district had achieved unitary status by eliminating '[t]o the greatest extent practicable' the vestiges of its prior policy of segregation." *Id.* at 715-16.

This made the proper focus in *Parents Involved* whether these districts could voluntarily adopt race-conscious student assignment plans as a matter of general educational policy. The Court held they could not. It stressed that it had recognized only two interests as compelling for these purposes: "remedying the effects of past intentional discrimination," *id* at 720, and "the interest in diversity in higher education upheld in *Grutter*." *Id.* at 722. Neither applied on the facts presented, and the Court declined to consider whether the diversity rationale could be extended to K-12 education given that "it is clear that the racial classifications employed by the districts are not narrowly tailored to the goal of achieving the educational and social

-19-

benefits asserted to flow from racial diversity." *Id.* at 726.

This is not a case about a policy decision. It is rather one focusing on a remedy designed to "eliminate the vestiges of . . . prior dual status." *Id.* at 737. As this Court stated in no uncertain terms when it vacated the District Court holding and opinion in *Teague*:

> We note that the exemptions under the 2013 Act are limited to individual school districts that are subject to federal desegregation mandates, a regime totally unlike the statutory race-based limitation in section (f)(1) of the 1989 Act. Under *Parents Involved*, equal protection challenges to the 2013 Act would be subject to a very different analysis than the district court applied in invalidating section (f)(1). *See* 551 U.S. at 793-96 (Kennedy, J., concurring). Moreover, the challenges would be to individual school district claims of exemption under the 2013 Act, not to a statewide statutory limitation on school transfers based on racial factors.

*Teague*, 720 F.3d at 977 n. 2.

The focus in this passage was on one section of one of the "changes" in the law the Appellants trumpet, the Arkansas General Assembly's decision to repeal the 1989 Act. *See* Public School Choice Act of 2013, Ark. Code. Ann. §§ 6-18-1901 *et seq*. As Judge Dawson noted, the 2013 Act "removed the race-based limitation on public school choice transfers" but "only permitted nonresident transfers 'provided that the transfer by the student does not conflict with an enforceable judicial decree or court order remedying the effects of past racial segregation in the school district.'"

-20-

Memorandum Opinion and Order at 3, J.A. 306 (quoting Ark. Code Ann. § 6-18-1901(b)(3)). In effect, the 2013 Act's recognition of the need to respect desegregation orders and decrees continued a key state policy: "to permit the free transfer of students within its school districts provided that the transfers did not adversely impact the racial make-up of the school district receiving the transferring students." *Teague*, 873 F. Supp. 2d at 1057.

As such, both the 2013 Act and the Settlement Agreement recognize a principle embraced by all members of the Supreme Court in *Parents Involved*. "[N]o one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies – whether or not a court had issued an order to that effect." *Parents Involved*, 551 U.S. at 737. Here the Settlement Agreement functions as and was found to be "'a court-approved desegregation plan that should remain in effect despite recent changes in the law on which the settlement agreement was partly based.'" Memorandum Opinion and Order at 4, J.A. 307 (quoting Order at 4, J.A. 209)).

That is, it falls squarely within a long and unchanged line of Supreme Court decisions recognizing that "[n]otwithstanding" the general ban on "treat[ing] whole classes of persons differently based . . . on race" the "allocation of benefits and burdens through individual racial classification [has been] found sometimes

-21-

permissible in the context of remedies for *de jure* wrong." *Parents Involved*, 551 U.S. at 795-96 (Kennedy, J., concurring). *See also id.* at 796 (Kennedy, J., concurring) ("Where there has been *de jure* segregation, there is a cognizable legal wrong, and the courts and legislatures have broad power to remedy it."); *id*. at 823 (Breyer, J., dissenting) (noting that a "longstanding and unbroken line of legal authority tells us that the Equal Protection Clause permits local school boards to use race-conscious criteria to achieve positive race-related goals").

The Settlement Agreement is then consistent with what the Supreme Court has described as "the broad discretionary powers of school authorities" in remedial situations to "formulate and implement educational policy," policies that may well require "a prescribed ratio of [Black] to [Non-Black] students." *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16 (1971). In particular, it lies comfortably within "a district court's equitable powers to remedy past wrongs . . . for breadth and flexibility are inherent in equitable remedies." *Id.* at 15. "The notion that this Court should craft special and narrow rules for reviewing judicial decrees in racial discrimination cases was soundly rejected in *Swann*." *Paradise*, 480 U.S. at 191 (Stevens, J., concurring).

Indeed, the Court has stressed that "[w]e see no misuse of mathematical ratios . . . in light of . . . the continued existence of 'some schools that are all or

-22-

predominantly of one race.'" *Columbus Board of Education v. Penick*, 443 U.S. 449, 455 n. 3 (1979) (quoting *Swann*, 402 U.S. at 26)). And in one notable instance it approved a remedy that imposed an absolute quota on promotions, a device routinely described as abhorrent in the line of cases on which Appellants rely. *Compare*, *Paradise*, 480 U.S. at 166 (given that it is "well established that . . . courts may constitutionally employ racial classifications to remedy unlawful treatment of racial and ethnic groups subject to discrimination" Court sustains a "one-for-one promotion quota" designed to "compensate for past discrimination"), with *Parents Involved*, 551 U.S. at 726-27 (condemning the plans at issue as ones relying on "racial demographics" rather than "pedagogical concepts"), and *Grutter*, 539 U.S. at 334 ("universities cannot establish quotas for members of certain racial groups"), and *Gratz*, 539 U.S. at 293 (Souter, J., dissenting) ("record does not describe a system with a quota like the one struck down in *Bakke*), and *Croson*, 488 U.S. at 499 (a "lack of opportunities for black entrepreneurs . . . standing alone . . . cannot justify a rigid racial quota").[4]

---

[4] It is important to note that while Justice Brennan's plurality opinion in *Paradise* analyzed the one-for-one promotion remedy within the parameters of strict scrutiny that discussion made it clear that that was not the operative standard. *See Paradise*, 480 U.S. at 166-67 (stressing that "the broad relief ordered survives *even* strict scrutiny analysis") (emphasis added); *id*. at 190 n. 1 (Stevens, J., concurring) (characterizing the contention that strict scrutiny is required in such cases as "novel").

Appellate Case: 15-1919    Page: 32    Date Filed: 09/01/2015 Entry ID: 4311995

Appellants make much of the fact that the constitutional violations set forth in the original complaint were "alleged," Appellants' Brief at vii, that "the district court has not found past intentional discrimination," *id.* at 25, that "none of the school districts admitted a constitutional violation" and "[t]he district court never made any factual findings that the school districts had engaged in discriminatory practices." *Id.* at 28. All true. And all irrelevant. Just like the defendants in *Smith,* the "[d]efendants [here] denied all the allegations of discrimination." *Smith*, 769 F.3d at 569. Just as was the case in *Smith*, "the lawsuit was settled by the parties agreeing to the [Settlement Agreement], approved by the court in a consent decree." *Id.* at 572. And just as is always the case, the Appellants "always retain the option to . . . return to litigation, with all the risks that this implies." *Little Rock School District v. Pulaski County Special School District*, 921 F.2d 1371, 1388 (8th Cir. 1990).

The Appellants voluntarily agreed to the Settlement Agreement. They had the option to defend. They did not. If, as they allege with such certainty now, the Appellants actually did nothing wrong, then they should have pressed to have their day in court. The reasons why they did not do so have no bearing on the simple fact that they did not have the litigation courage to match their supposed constitutional convictions.

The cases on which the Appellants rely do not accordingly apply when the

Appellate Case: 15-1919     Page: 33     Date Filed: 09/01/2015 Entry ID: 4311995

focus shifts from whether a state policy is constitutional to whether a federal court order is an appropriate remedy. Indeed, this Court allowed the Little Rock School District to intervene in the *Teague* appeal to make that precise point: strict scrutiny is not the operative standard in such cases. *See* Amicus-Curiae Brief in Support of Defendants-Appellants at 9, *Teague*, 720 F.3d 973 (8th Cir. 2013) (No. 12-2413) ("As far as LRSD can determine, no remedy for *de jure* school segregation has ever been subjected to strict scrutiny.").

## C. The District Court Decision in *Teague* Has Neither Force Nor Bearing in This Case

The Appellants also place considerable reliance on the District Court decision and opinion in *Teague*. As a threshold matter, *Teague* no longer exists in any meaningful sense. The original Memorandum Opinion and Order in *Teague* has been vacated as moot. *See* 720 F.3d at 979 ("The Memorandum Opinion and Order and the Judgment of the district court dated June 8, 2012, are vacated, and the case is remanded with directions to dismiss the Parents' complaint as moot."). That means (although the Appellants do not concede it) that the constitutionality of § 6-18-206(f)(1) – a provision that is no longer in force as a matter of general statutory command in Arkansas – is an open question. As this Court stressed in the wake of a similar holding that a previous judgment had been vacated as moot, the

-25-

constitutional question posed in that litigation "remains an open question in this Circuit." *Anastasoff v. United States*, 235 F.3d 1054, 1056 (8th Cir. 2000).

Regardless, the issue in *Teague* was whether a legislative choice made by the Arkansas General Assembly could withstand the rigors of strict scrutiny. The District Court held that it could not, concluding that the restriction on school choice transfers articulated in § 6-18-306(f)(1) was not narrowly tailored. *Teague*, 873 F. Supp. 2d 1066-68. As part of its analysis, the District Court discussed *Parents Involved*, noting the pertinent reality that the two districts in that case had not "operated legally segregated schools or had been found to be unitary." *Id.* at 1066. In particular, it emphasized that "[t]he parties produce no evidence that either" of the districts involved in *Teague* "are or were in the past subject to a desegregation-related court order" and that "[t]he parties have identified no history of past intentional discrimination with respect to the Magnet Cove School District." *Id.*

That is not the situation here. The Appellants are subject to a "federal desegregation mandate," *Smith,* 720 F. 3d at 977 n. 2, a "consent desegregation plan of the Court." Order at 5, J.A. 210. Indeed, that very fact is the basis for their complaints.

The problem, of course, is that this case is not about the constitutionality of § 6-18-206(f)(1) *per se*. *See, e.g.,* Appellants' Brief at i (the "Settlement Agreement .

-26-

. . incorporates an outdated, unconstitutional law"); 10 (lamenting "continued enforcement of this unconstitutional law"). It is, rather, about whether the use of the general principle articulated in that provision is appropriate when it is inserted into a "settlement agreed to by all parties in the District Court." *LRSD*, 972 F.2d at 1383. Put another way, the current posture of this case does not require this Court to consider the constitutionality of a race-based limit on student choice transfers in the abstract, or simply as a matter of general educational policy. Rather, it requires that the Court consider its use in a Settlement Agreement that was negotiated and accepted by the *defendants* – here, the Appellants, Appellee HSSD, and the State of Arkansas – as a way to remedy the present effects of their own past discrimination.

The District Court recognized this in the 2013 proceedings when it stated expressly:

* The import of the [Settlement Agreement] and the Court's approval thereof was not simply a declaration that the parties would obey Arkansas law as it might from time to time be set forth in the School Choice Act of 1989;

* Rather, the import of those actions was to incorporate by reference the language, terms, and provisions of the 1989 Act as a consent desegregation plan of the Court applicable to all public school districts within Garland County, Arkansas, for the purpose of remedying the vestiges of prior *de jure* racial segregation within the public education system of that county.

Order at 5, J.A. 210.

-27-

It is worth noting that both of the Appellees – the original Plaintiffs and HSSD – argued that the Settlement Agreement should remain in place. The Plaintiffs stated, in no uncertain terms, their belief that "the Settlement Agreement should be declared to be contractual by the parties who entered into the agreement and that its provisions were more than just implementation of the School Choice Act." Response of the Plaintiffs to Petition for Declaratory Relief ¶ 11, J.A. 194. HSSD, in turn, stated that "[t]here exists a need for continued enforcement of the Settlement Agreement for the benefit of all Garland County school districts in remedying . . . vestiges of prior *de jure* racial segregation." Hot Springs School District's Response to Petition for Declaratory Relief ¶ 17(c), J.A. 203. The District Court holding agreeing with this could not have been clearer:

> The provisions of the Settlement Agreement consist of more than the mere implementation of the 1989 Act. It is a contract that also addresses the districts' staff development, curricula, testing and assessments, special education and gifted-and-talented programs, student-teacher interactions, and other services designed to enhance and improve public education in Garland County.

Order ¶ 8, J.A. 209. In a similar vein, the Court agreed that the express purpose of the Settlement Agreement was to "remedy the vestiges of prior *de jure* racial segregation within the public education system [in Garland] county" and that "neither the judicial decision declaring the 1989 Act to be unconstitutional, nor the repeal of

-28-

the 1989 Act, have any impact *per se* on the efficacy of the Settlement Agreement."
*Id*. at 5-6, J.A. 210-11.

The District Court noted this when it denied the current Rule 60(b)(5) motion. Memorandum Opinion and Order at 2-4, J.A. 305-07. The Court did not characterize that discussion as a rejection of the Appellants' contention that *Teague* and the repeal of the 1989 Act constituted "significant" changes in the law. Nevertheless, it is clear when assessed in the proper contexts that that is exactly what Judge Dawson did. He was fully aware of the facts, circumstances, and outcomes of the *Teague* litigation. He was also aware of the reality, and expressly stated, that Judge Hendren had previously acknowledged that "the Settlement Agreement constitutes a court-approved desegregation plan despite recent changes to the law on which the Settlement Agreement was *partly* based." *Id.* at 3-4, J.A. 306-07 (emphasis added).

## III.    Public Policy Supports the Settlement Agreement

When the District Court approved the Settlement Agreement, it issued what it expressly described as Findings of Fact, one of which was that the Settlement Agreement was "fair and reasonable" and "that it affords appropriate relief to the plaintiff class." Order and Memorandum, Findings of Fact, ¶ 4, J.A. 163. The Court's emphasis on the fairness and appropriateness of the relief granted was predictable, given that all of the parties – including the Appellants – had told the

-29-

Court that after "assessing the strengths and weaknesses of the claims presented by the plaintiff class" they "agreed to a comprehensive settlement agreement which provides *significant* relief for the plaintiff class." Joint Memorandum at 1-2, J.A. 151-52 (emphasis added). Indeed, the Settlement Agreement also approved an award of attorneys fees, a discretionary action that is normally associated with actual success by a "prevailing party."[5]

As the District Court recognized in an important proceeding that Appellants largely ignore, the Appellants entered into a "contract." Order, ¶ 8, J.A. 209. And it expressly characterized that "'bargained exchange between the litigants,'" *LRS D*, 921 F.2d at 1388 (quoting *Armstrong v. Board of School Directors of Milwaukee*, 616 F. 2d 305, 315 (7th Cir. 1980)), as "a court-approved desegregation plan." Order ¶¶ 5 & 8, J.A. 208-09. As such, the Settlement Agreement at issue in this case – like the one in *Smith* – fashioned a "framework for a concerted effort to end racial segregation in [Garland] County schools." *Little Rock School District v. Pulaski County Special*

---

[5] *See, e.g.*, 42 U.S.C. § 1988(b) ("In any action or proceeding to enforce [civil rights] the court, at its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs."); *Hewitt v. Helms*, 482 U.S. 755, 760 (1987) (observing that "[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail"); *Little Rock School District v. State of Arkansas*, 127 F.3d 693, 695 (8th Cir. 1997) ("where a settlement agreement serves to particularize the protections of the Equal Protection Clause of the Fourteenth Amendment" the court may award "attorneys' fee[s] . .. to a prevailing party").

-30-

*School District, # 1*, 56 F.3d 904, 912 (8th Cir. 1995). *See generally* Complaint, ¶¶ 17-29, J.A. 5-11 (detailed allegations regarding multiple aspects of a "segregated public education program" in Garland County).

As this Court has emphasized, "[a] strong public policy favors agreements, and courts should approach them with a presumption in their favor." *LRSD*, 921 F.2d at 1388; Joint Memorandum at 5, J.A. 155. Where, as here, that underlying case is a class action, "'the judiciary's role is properly limited to the minimum necessary to protect the interests of the class and the public.'" *LRSD*, 921 F.2d at 1388 (quoting *Armstrong*, 616 F. 2d at 315 (1980); Joint Memorandum at 5, J.A. 155.

The Appellants now complain that they are being held to the benefit of their bargain. That is not what the Supreme Court had in mind when it held that a Rule 60(b)(5) motion should be entertained when "changed circumstances warrant relief" because "'continued enforcement [is] 'detrimental to the public interest.'" *Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 384).

All parties to the Settlement Agreement clearly believed when they negotiated that document that the use of § 6-18-206(f)(1) was necessary given their desire to undertake "reasonable, good-faith efforts to solve seemingly intractable problems" and the need "to achieve integration to the maximum practicable extent." *LRSD*, 921 F.3d at 1384, 1388. The District Court approved the proposed agreement, mindful

-31-

of its obligation to accept an agreement that "address[es] the serious problems of the plaintiff class." *Id.* at 1384. Its two recent decisions to leave the Settlement Agreement in place took into account what has actually been achieved and was most assuredly not an "abuse of discretion."

## IV. THE OPERATIVE FACTS DO NOT SUPPORT THE CLAIMS OF "CHANGED CIRCUMSTANCES" OR JUDICIALLY COGNIZABLE "INEQUITIES"

The Appellants characterize the 1989 Act as "the cornerstone of the Settlement Agreement," Appellants' Brief at 22, dismiss important and undeniable realities about the continuing racial composition of the Garland County Schools as "nothing more than demographic information without context," *id.* at 30, and offer the experiences of the Wilson family as an example of "inequitable school-choice decisions . . . occur[ing] in Garland County." *Id.* at 4. But simply stating their opinion that the Settlement Agreement rises and falls on the 1989 Act does not make it so. More to the point, these undisputed facts and undeniable realities make it abundantly clear that the District Court did not abuse its discretion when it rejected the Appellants' request to terminate the Settlement Agreement.

The pertinent question is whether the facts support the Appellants' attempt to eradicate the entire agreement rather than – at most – simply seeking its modification. The Appellants do not, notably, claim that the single most pertinent fact has changed:

-32-

the racial composition of the Garland County schools remains today almost exactly as it was when the Settlement Agreement was entered in 1991. *See supra* at 7 (Statement of Facts). The six "predominantly white" districts at the time the Settlement Agreement was approved – the Appellants here – remain "predominantly white." HSSD, which was the only Garland County district that had a student enrollment pattern that was not predominantly white in 1992, is today the only district with what might be characterized as a "critical mass" of minority students. Memorandum Opinion and Order at 6 n. 5, J.A. 309.

The Appellants argued below that the provision from the 1989 Act incorporated in the Settlement Agreement "has outlived its usefulness." Districts' Brief at 2, J.A. 220. They shift ground slightly before this Court, alleging that the undeniable facts about the continuing presence of racially identifiable schools "simply point[] out that the Settlement Agreement has apparently been ineffective." Appellants' Brief at 31.

Neither characterization has merit. It is perhaps more accurate to say that the 1989 Act did not meet all of the pressing needs posed by the situations presented. Periodic invocation of § 6-18-206(f)(1) may have stemmed the tide of segregative transfers. Unfortunately, it did nothing to encourage integrative transfers, which explains why the districts look substantially the same today as they did in 1989.

-33-

The simple, undeniable fact is that "vestiges of past discrimination" persist, *Smith*, 769 F.3d at 572, in the form of racially identifiable schools. The Appellants offer no evidence to the contrary and attempt to dismiss important data as "demographic information without context." Appellants' Brief at 30. But a long line of cases does indeed focus on "constitutional wrong[s] in terms of an established geographic and administrative school system populated by both Negro and white children." *Milliken v. Bradley*, 418 U.S. 717, 747 (1974). "In such a context," the Court stressed, "terms such as 'unitary' and 'dual' systems, and 'racially identifiable schools,' have meaning, and the necessary federal authority to remedy the constitutional wrong is firmly established." *Id.*

The Appellants' sole attempt to marshal facts in their favor is the observation that "three otherwise qualified African-American children" were not allowed to transfer from Lake Hamilton to Mountain Pine "solely because the Walkers are African-American." Appellants' Brief at 5. They characterize this as "indefensible." *Id.* But, as Appellees have established, their attempts to justify that label as a matter of law cannot withstand scrutiny, premised as they are on a body of precedents that do not apply to the situation presented by this case.

As a matter of simple reality, in turn, the Appellants offer no specific reasons in support of the Walkers' transfers, other than the distances involved between the

-34-

respective schools. But that is a consideration that could have been dealt with via a petition for a transfer "for any child . . . whose place of residence is at least fifteen (15) miles from the school in the resident district and whose place of residence is within seven (7) miles of a school in an adjoining district." Ark. Code Ann. § 6-18-307. That option certainly seems to apply to the Walker children on the facts alleged by the Appellants. It was, nevertheless, one the Walker family did not pursue and one that neither Lake Hamilton nor Mountain Pine apparently suggested. That is especially notable, since, unlike other available choice/transfer programs,[6] this option does not contain a bar on student movement when, as is the case here, a valid federal court desegregation order and plan are in place.[7]

---

[6] *See, e.g.*, The Arkansas Opportunity Public School Choice Act of 2004, Ark. Code Ann. § 6-18-227(a)(4) (creating a "public school choice program . . to enable any student to transfer from a failing school to another public school in the state"). That option is "subject to [certain] restrictions," one of which is the transfer not "conflict with the provisions of a federal desegregation court order applicable to a school district." Ark. Code Ann. § 6-18-227(e)(2)). A second option is legal transfer, which allows resident and receiving districts to "enter into an agreement . . . for purposes of education," Ark. Code Ann. § 6-18-316(a), unless "either the resident or the receiving district is under a desegregation court order or has ever been under such a court order," Ark. Code Ann. § 6-18-317(a)(1), or "[the transfer in question would negatively affect the racial balance of that district which is or has been under such a court order," Ark. Code Ann. § 6-18-317(a)(2)).

[7] The fact that the General Assembly has seen fit to limit choice and/or transfer movement where federal court desegregation orders and/or agreements are in place suggests that careful attention should be paid to why that is so. Such limits are hardly surprising in a state where, like most of those in the South, "choice" programs became

-35-

The fact that a given school remains racially identifiable may not, as the Supreme Court acknowledged in *Freeman*, justify the continuation of federal court oversight. Relief from that oversight does, however, require more than the bald assertion that the Appellant districts have "complied." That is especially the case when, as it is here, the parties seeking relief ask that an entire agreement with multiple purposes and provisions be set aside based on an alleged infirmity in one.

It is also essential that care be taken in an environment within which the checks formerly imposed by restrictions in the 1989 Act have been replaced by the less stringent regime embodied in the 2013 Act. That measure acknowledged its own potential to have a negative impact on school attendance patterns and directed the State Department of Education to "collect data . . . to determine if a racially segregative impact has occurred to any school district." Ark. Code Ann. § 6-18-907(c)(1). As the Appellees noted in the proceedings below, the first such report, the *Public School Choice Act of 2013 Net Gain/Loss Report* (Exhibit 2, J.A. 279-83), does not draw any conclusions. But it does report potentially disturbing trends. For example, the Malvern School District, the only district in Hot Spring County that currently has a "critical mass" of black students, reported a net loss of 118 students, 110 of whom were white. *Id.* at 3, J.A. 281. The Bauxite School District, which is

---

a favored way to avoid the desegregation mandates issued by the Supreme Court.

Appellate Case: 15-1919     Page: 45     Date Filed: 09/01/2015 Entry ID: 4311995

both adjacent to Malvern and historically white, reported a net gain of 94 students, 84 of whom are white.  *Id.* at 1, J.A. 279.  These and other trends documented in the Report illustrate why, when the Settlement Agreement was approved, both the parties and the Court felt it essential to include a race-based restriction on school choice in the Agreement.  They also demonstrate why attention, and caution, are called for now.

Finally, it is important to understand that the attempt by the Appellants to rely on the supposed plight of the Walker children is misplaced.  The Appellants claim, without any attempt to explain why this can or should have happened, that Ms. Walker somehow "discovered that her property is technically in the Lake Hamilton School District," Motion for Relief from Judgment Under Fed. R. Civ. P. 60(b)(5) ¶ 7, J.A. 213, and that there was some sort of "misunderstanding as to whether their home was in the Mountain Pine or the Lake Hamilton school district."  Brief in Support of Motion for Relief from Judgment Under Fed. R. Civ. P. 60(b)(5) at 2, J.A. 220.  They also emphasize what they clearly wish to be seen as a geographic inequity, stressing that "[t]he Mountain Pine schools are only 3.8 miles from their home, whereas the Lake Hamilton schools are 22 miles from their home."  *Id.*

The operative state law provisions make the importance of the actual place of residence clear:

The public schools of any school district in this state shall be open and

Appellate Case: 15-1919     Page: 46     Date Filed: 09/01/2015 Entry ID: 4311995

free through the completion of the secondary program to all persons in this state between five (5) and twenty-one (21) years of age whose parents, legal guardians, or other persons having lawful control of the person under a court order *reside within the school district* and to all persons between those ages who have been legally transferred to the district for education purposes.

Ark. Code Ann. § 6-18-202(b)(1) (emphasis added). A "resident," for these purposes, is someone who actually "reside[s] in the school district." *Id.* § 6-18-202(a)(2). "Reside," in turn, means to "be physically present and to maintain a permanent place of abode." *Id.* § 6-18-202(a)(1).

State law does not actually and absolutely mandate that a district demand proof of actual residence as part of the enrollment process. "Any school district *may* require a parent . . . who enrolls a child in a school district to sign a statement under oath attesting to his or her residential address or to provide other proof that a student is a resident of the school district as defined by this section." Ark. Code Ann. § 6-18-202(b)(3) (emphasis added). Further, the list of "requirements for enrollment in [a] public school," Ark. Code Ann. § 6-18-208, does not include proof of residence. Nevertheless, state law makes it quite clear that there are significant risks posed when a district does not exercise due care:

Any school district which admits for ten (10) school days or more a student the school district knows, or should have known, is a resident of another school district not included in a tuition agreement, or not officially transferred to it, shall be liable to the resident school district

-38-

of the student for an amount of money of state aid the resident district would have received or seven hundred fifty dollars ($750) per year, whichever is greater.

Ark. Code Ann. § 6-18-205(b)(1)(A).

The Lake Hamilton and Mountain Pine districts did not, apparently, exercise due diligence with regard to the actual legal residence of the Walker children. That is arguably their prerogative. They now wish to seize on that episode and its supposedly unfair consequences for that family. What they fail to admit is that those results follow from their own failures to act in an administratively sound and fiscally responsible manner. The reality is that the "injustices" and "inequities" of which they complain are illusory, and are certainly insufficient to relieve them of obligations in the Settlement Agreement that they voluntarily accepted.

More to the point, to the extent that concerns about the Walker children have any bearing in this matter, it is important to recognize that a choice transfer pursuant to the 2013 Act was not when they applied and is not now the only option available to them. *See supra* at 34-35. The 2013 Act is simply one of a number of choice and/or transfer options made available to students and their parents in Arkansas as a matter of legislative grace, rather than constitutional obligation.

The proverbial bottom line is that the Appellants have tried to rely on the Walker narrative as part of their attempt to depict continued adherence to their

-39-

voluntarily assumed contractual obligations as unfair and inequitable. The terms of the Settlement Agreement did indeed dictate that the choice transfers requested by the Walkers could not and should not be granted. That episode does not, however, offer the sort of evidence pertinent to a request by the Appellants that they be released from their voluntarily assumed obligations "when changed circumstances have caused [them] to be unjust." *Smith*, 769 F.3d at 568.

## CONCLUSION

Unhappy with the benefits and burdens of a bargain that they themselves voluntarily struck, the Appellants seek total termination of the Settlement Agreement. Neither the law nor the facts support their request, and it should be denied.

Respectfully submitted,

Allen P. Roberts (Ark. Bar No. 64036)
Allen P. Roberts, P.A.
Post Office Box 280
Camden, Arkansas 71711
Telephone: (870) 836-5310
Facsimile: (870) 836-9662
Email: allen@aprobertslaw.com

And

-40-

Whitney F. Moore (Ark. Bar No. 2009193)
FUQUA CAMPBELL, P.A.
Attorneys at Law
3700 Cantrell, Suite 205
Little Rock, Arkansas 72202
Telephone: (501) 374-0200
Facsimile: (501) 975-7153
Email: wmoore@fc-lawyers.com

By: **/s/ Whitney Moore**
Whitney F. Moore

Counsel for Hot Springs School District

AND

Q. Byrum Hurst (Ark. Bar No. 74082)
Justin Hurst (Ark. Bar No. 2005021)
Hurst Law Group
518 Ouachita Avenue
Hot Springs, Arkansas 71901
Telephone: (501) 623-2565
Facsimile: (501) 623-9391
Email: qbyrum@hurstlaw.org
Email: justin@hurstlaw.org

Counsel for the Plaintiffs-Appellees

Appellate Case: 15-1919   Page: 50   Date Filed: 09/01/2015 Entry ID: 4311995

# CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief, which is being submitted pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, contains 10,035 words as calculated by the word count function of the word-processing system (Word Perfect X4) used to prepare this brief.  This brief has been scanned for viruses and is virus-free.


**/s/ Whitney F. Moore**
Whitney F. Moore

Appellate Case: 15-1919    Page: 51    Date Filed: 09/01/2015 Entry ID: 4311995

# CERTIFICATE OF SERVICE

I, Whitney F. Moore, do hereby certify that I filed the foregoing on the Court's CM/ECF system which shall send notification of such filing to:

Jess Askew, III (jess.askew@kutakrock.com)

Ashley Welch Hudson (ashley.hudson@kutakrock.com)

D. Scott Hickam (dscotthickam@sbcglobal.net)

Rosalyn Middleton (rosalyn.middleton@arkansasag.gov)

Kendra Clay (kendra.clay@arkansas.gov)

on this 27th day of August, 2015.

/s/ **Whitney Moore**
Whitney F. Moore

Appellate Case: 15-1919     Page: 52     Date Filed: 09/01/2015 Entry ID: 4311995